CENTRAL TRUST CO. OF NEW YORK v. WABASH, ST. L. & P. RY. CO.
et al., (SWAYNE, Intervenor.)

*(Circuit Court, D. Indiana. February 10, 1891.)*

RAILROAD MORTGAGE—LEASED LINES—PRIORITIES.

  Where an insolvent railroad company upon its own petition procures the appointment of receivers, to take possession of its road and leased lines, and in the same suit trustees of a mortgage upon the property ask and are denied an appointment of receivers or an extension of the receivership under their cross-bill, but obtain a decree of foreclosure and a sale of the property thereon, the rentals of the leased lines while in the possession of the receivers do not become a charge upon the *corpus* of the property to be paid in preference to the mortgage debt.

In Equity. On exceptions to master's report.

The intervenor, as trustee of mortgages upon what was known as the "Indianapolis, Peru & Chicago Railroad," extending from Indianapolis to Michigan City, claims compensation for the use of that road and its equipment by the receivers herein. The demand is made in the alternative, either for the net earnings of the road while in the possession of the receivers, or for the amount which under the contracts of June 1, 1881, the Wabash Company, if it had remained in control, would have been bound to pay for the use during the same period of time. The net earnings the master has reported at $261,906.70, the rental under the contracts at $226,053.65, and, following the decision in *Brown* v. *Railroad Co.*, 35 Fed. Rep. 444, has recommended that the latter sum be allowed. Numerous objections are made to the report, but the principal question is one of priority of right or of lien upon the property which must be charged with the payment of the claim, if payment should be ordered. There is no fund out of which direct payment can be made, but by the terms of the decree entered at St. Louis on January 6, 1885, foreclosing the general mortgage upon the Wabash road, by virtue of which decree the road was sold, the court reserved the power to resume possession and to order a resale of the property, if necessary, for the discharge of liabilities or claims entitled to preference over mortgage indebtedness; and the question is whether or not this claim is of that character. By the two contracts of June 1, 1881, one of which was made by the Indianapolis, Peru & Chicago Railroad Company and the other by the Michigan City & Indianapolis Company, the roads composing the Indianapolis, Peru & Chicago road, with appurtenances and equipment, were leased to the Wabash, St. Louis & Pacific Railway Company for the term of forty years. Included in the contract of the Indianapolis, Peru & Chicago Company was that part of the road between Peru and La Porte, owned by the Chicago, Cincinnati & Louisville Company, and of which the Indianapolis, Peru & Chicago Company had possession under a contract dated November 15, 1872, subject to a mortgage for $1,000,000, executed January 1, 1867, to George T. M. Davis, trustee. The Indianapolis, Peru & Chicago road proper, extending from Indianapolis to Peru, was also subject to a mortgage for $275,000. In consideration of the execution of these leases, the Wabash Company, besides

assuming all liabilities of the lessor companies, executed its negotiable forty-year bonds, bearing six per cent. annual interest, payable semi-annually, to the Indianapolis, Peru & Chicago Company for $1,350,000, and to the Michigan City & Indianapolis Company for $325,000; and, to secure the payment of the bonds delivered to it, each of those companies executed a mortgage or trust-deed of its road to Abram W. Hendricks and the intervenor, as trustees. In those deeds, and also in the contracts of lease, it was provided that for any default of the Wabash Company, continued for ninety days, to pay interest due upon its bonds, the trustees or lessors might re-enter and repossess the leased roads and rolling stock. The Wabash Company gave no security for the performance of its covenants, or for the payment of principal or interest of its bonds, though its entire tangible property was at the time subject to the general mortgage of June 1, 1880, made to secure an issue of bonds for $50,000,000, of which issue bonds to the amount of $17,000,000 had been executed and were outstanding, and the lines of road on the east side of the Mississippi river were also under the mortgages of 1867 and 1879 for large amounts. By an agreement between William Cutting, as executor of the will of Francis P. Cutting, and Solon Humphreys, as president of the Wabash Company, which, though bearing a later date, seems to have been made before the contracts of lease, Cutting undertook to procure the execution of those contracts by the railroad companies, and to cause the capital stock of those companies, excepting the shares necessary to keep the organizations alive, to be deposited with Swayne and Hendricks, trustees, for certain specified uses during the term of the lease, and stipulated that at the end of that term the stock should become the absolute property of the Wabash Company, if meanwhile it had performed its covenants and paid the interest upon its bonds. Under the contracts so made, the Indianapolis, Peru & Chicago road became and continued to be a part of the Wabash system until May 29, 1884, when, upon the petition of the Wabash Company, avowing its own insolvency and inability, without the aid of the court, to retain control of leased lines and keep the system intact, the United States circuit court sitting at St. Louis appointed Messrs. Humphreys and Tutt receivers, and put them in possession. Two days later, on June 1st, the company made default in the payment of interest upon its bonded indebtedness, including that of which the intervenor was trustee, and within a few days thereafter the Central Trust Company and James E. Cheney, trustees, filed a cross-bill in the case for the foreclosure of the general mortgage, in which they prayed for the appointment of a receiver in the interests of their trust; but the application, though renewed in October and November of the same year, was in each instance denied. Afterwards the trustees filed original bills for the foreclosure of the general mortgage in the courts of the states in which the different lines of the system were situate, and upon removal of the suits to the United States courts, where a consolidation with the original suit of the Wabash Company was soon ordered, the trustees made application to have receivers appointed, or for an extension of the existing receivership to the general mortgage, and this application was also de-

nied. Pending these proceedings, Wager Swayne and Abram W. Hendricks were parties to the suit, as trustees, and had entered their appearance. Wager Swayne was also counsel for the Wabash, St. Louis & Pacific Railway Company, and presented the bill upon which Messrs. Humphreys and Tutt were appointed receivers. George T. M. Davis, trustee of the Chicago, Cincinnati & Louisville mortgage, was also a party to the suit, and had entered his appearance therein. The consolidated cause for foreclosure of the general mortgage, at St. Louis, went to decree in January, 1886; and the lines of railway composing the Wabash system, excepting such of them as had been surrendered by the receivers to trustees and others by order of the court, were sold to a committee of general mortgage bondholders in April, 1886, which sale was confirmed, and the receivers were ordered to deliver the property to the purchasers. Before delivery the receivers were removed from the possession of the lines east of the Mississippi river, and another receiver was appointed for those lines by the United States circuit court for the southern district of Illinois, who took possession on January 1, 1887. The lines on the east side of the river were sold afterwards upon a decree rendered in the seventh circuit, foreclosing the mortgages of 1867 and 1879, and were purchased by the same committee which purchased under the decree at St. Louis. This sale was also subject to a reserved power of the court to retake possession, if necessary, to enforce payment of claims or liabilities entitled to preference over the mortgage debts. While the decree foreclosing the general mortgage declared that the lien of that mortgage attached to leased lines "to the extent of the interest of the Wabash Company therein," it excepted the Indianapolis, Peru & Chicago and some other lines from the order of sale. The order of court appointing Humphreys and Tutt receivers, besides directing the payment of rentals and other claims out of the income which should come to their hands, contained the following, viz.: "That such receivers keep such accounts as may be necessary to show the sources from which all such income and moneys shall be derived, with reference to the interest of all parties herein, and the expenditures made by them." And on June 28, 1884, the court directed the receivers to keep accounts of all the earnings and income from, as well as of all the operating expenses and cost of maintenance and taxes of, certain named lines or divisions, including the Indianapolis, Peru & Chicago road; "and make quarterly reports thereof, showing not only the income and expenses of each of the lines aforesaid, but also the methods by which the incomes and expenses of the lines were respectively ascertained." Reports were made accordingly, which showed a net income from the Indianapolis, Peru & Chicago lines, while in the hands of the receivers, of $100,-760.70; and, no exceptions having been filed, the reports were confirmed by an order of court entered on the 10th day of October, 1887. On April 16, 1885, an opinion and order was rendered and entered by Circuit Judge BREWER, (23 Fed. Rep. 865,) containing the following:

"Subdivisional accounts must be kept separately, * * * in order that the particular equities of each one of these divisions, as between themselves,

may be ascertained. When any subdivision earns a surplus over expenses, the rental or subdivisional interest will be paid to the extent of the surplus. * * * Any net earnings should be paid over to the lessor, or, if there be a subdivisional mortgage, to the mortgagee. There will be no modification of the order heretofore entered concerning receivers' certificates, but all equities respecting them, as between various subdivisions, will be adjusted in the final decree. * * * When it comes to a sale of the road or other final disposition of the matter, it may be there will be such equities as will justify the casting the burden of these certificates upon one division rather than another."

On the 23d of October, 1885, in obedience to an order of the court made at the instance of the intervenor, the receivers surrendered to him the road in question, and its equipment, except that portion covered by the mortgage to Davis, trustee, which under a like order had been surrendered to him on the preceding 8th of June. The orders of the court, in addition to the surrender of possession by the receivers, authorized Davis and Swayne, as trustees, to prosecute suits in this court for the foreclosure of their respective mortgages, and directed the receivers to appear here, and present for adjudication any demand they had as receivers against the Indianapolis, Peru & Chicago road, or its subdivisions, for operating expenses, or on account of receivers' certificates issued under orders of the court for liabilities antedating the appointment of receivers; and also to appear to, answer, and litigate to final adjudication any claims, by way of set-off or counter-claim, against them, growing out of and properly connected with any such claims presented by them as receivers. Accordingly, upon cross-bills filed here in the consolidated cause, Swayne and Davis, as trustees, procured decrees foreclosing their respective mortgages, under which the several properties were sold in 1886, and passed into the possession of the Lake Erie & Western Railway Company, which still owns them. The issues joined between the parties, in respect to the matters now in dispute, need not be more particularly stated.

*McDonald, Butler & Snow,* for intervenor.

*Wells H. Blodgett* and *C. B. & W. V. Stuart,* for respondent.

WOODS, J., (*after stating the facts as above.*) If the intervenor's claim has any just foundation, it is in the doctrine of *Fosdick* v. *Schall,* 99 U. S. 235. That doctrine has been defined and illustrated in a number of later cases, quotations from two of which (*St. Louis, etc., R. Co.* v. *Cleveland, etc., Ry. Co.,* 125 U. S. 668, 8 Sup. Ct. Rep. 1011, and *Kneeland* v. *Trust Co.,* 136 U. S. 89, 10 Sup. Ct. Rep. 950) will be found to be especially applicable here. In the first case it is said:

"It is undoubtedly true that operating expenses, debts due to connecting lines growing out of an interchange of business, and debts due for the use and occupation of leased lines, are chargeable upon gross income before that net revenue arises which constitutes the fund applicable to the payment of the interest on mortgage bonds. But there is here no question in respect to current income. The fund in court is the proceeds of the sale of the property, and represents its *corpus;* and it cannot be claimed that ordinarily the unsecured debts of an insolvent railroad company can take precedence, in the distribution of the proceeds of a sale of the property itself, over the creditors who are

secured by prior and express liens. There are cases, it is true, where, owing to special circumstances, an equity arises in favor of certain classes of creditors of an insolvent railroad corporation, otherwise unsecured, by which they are entitled to outrank, in priority of payment, even upon the distribution of the proceeds of a sale of the body of the property, those who are secured by prior mortgage liens. The rule governing in all these cases was stated by Chief Justice WAITE in *Burnham* v. *Bowen*, 111 U. S. 776, 783, 4 Sup. Ct. Rep. 675, as follows: 'That, if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has thus been improperly applied to their use.' There has been no departure from this rule in any of the cases cited; it has been adhered to and reaffirmed in them all. * * *

It cannot be said that the application of earnings to the payment of the interest on the first mortgage bonds is chargeable to the holders of the second and third mortgage bonds; the latter alone are interested in the fund for distribution. That fund, in the sense of the rule sought to be applied, cannot be said to have been benefited by the payment to other bondholders from the gross earnings applicable to the payment of rent. The equity of the petitioner, if in fact it exists, is against the holders of the first mortgage bonds who have actually received the money to which it claims to be equitably entitled."

In *Kneeland* v. *Trust Co.* the claims were for the rental of rolling stock, which had been obtained by the railroad company on conditional contracts of purchase, in the form of leases, reserving title in the vendors, with right to retake possession on default in the payment of certain annual sums called "rent." The first application for a receiver was made August 1, 1883, by a judgment creditor. The trustees in the mortgages upon the road were made parties to the bill, and entered their appearance, neither objecting nor consenting, and a receiver was appointed, who continued in possession until the ensuing December 1st, when, upon bills brought by those trustees, the court appointed another receiver and, in accordance with the prayer of the bill, put him in possession both of the road and the rolling stock. The claims presented were for rentals during both receiverships, and, there being no other resource, payment was asked out of the proceeds of sale, to the exclusion *pro tanto* of the mortgage debts. The court, among other things, said:

"Upon these facts we remark, first, that the appointment of a receiver vests in the court no absolute control over the property, and no general authority to displace vested contract liens. Because in a few special and limited cases this court has declared that unsecured claims were entitled to priority over mortgage debts, an idea seems to have obtained that a court appointing a receiver could rightfully burden the mortgaged property for the payment of any unsecured indebtedness. * * * One holding a mortgage debt upon a railroad has the same right to demand and expect of the court respect for his vested and contracted priority as the holder of a mortgage on a farm or lot. So, when a court appoints a receiver of railroad property, it has no right to make that receivership conditional on the payment of other than those few unsecured claims which, by the rulings of this court, have been declared to have an equitable priority. No one is bound to sell to a railroad company, or to work for it, and whoever has dealings with a company whose property is mortgaged must be presumed to have dealt with it on the faith of its personal responsibility, and not in expectation of subsequently displacing the priority of the mortgage liens. It is the exception, and not the rule, that such priority of liens can be displaced. * * * So that these intervenors acquired no

right of priority by virtue of their antecedent contracts of sale. But it is argued, and with force, that the court did not allow contract price, but only rental; and the question is asked, may a court, through its receiver, take possession of property, and pay no rental for it? If it may legitimately compel the operation of a railroad in the hands of its receiver, in order to discharge the obligations of the company to the public, may it not also, and must it not also, burden that receivership, and the property in charge of the receiver, with all the expenses connected with the operation of the road, together with reasonable rentals for the property used and necessary for the operation of the road? As to the general answer to these inquiries we have no doubt. A court which appoints a receiver acquires, by virtue of that appointment, certain rights and assumes certain obligations; and the expenses which the court creates in discharge of those obligations are burdens necessarily on the property taken possession of; and this, irrespective of the question who may be the ultimate owner, or who may have the preferred lien, or who may invoke the receivership. So if, at the instance of any party entitled thereto, a court should appoint a receiver of property, the same being railroad property, and therefore under obligations to the public of continued operation, it, in the administration of such receivership, might rightfully contract debts necessary for the operation of the road, either for labor, supplies, or rentals, and make such expenses a prior lien on the property itself. * * * The holder of the lien upon the realty commences suit to foreclose its lien, and asks the court to take possession, through its receiver, of both the real and personal property. In the latter it had a remote interest, though subordinate to existing liens. The court, responding to its demands, takes possession of all the property, real and personal. Now, when the holder of a first lien upon the realty alone asks the court in chancery to take possession, not only of the real, but also of personal, property, and for the benefit of the real, that application is a consent on its part that the rental value of the personalty thus taken possession of and operated for the benefit of the realty shall be paid in preference to its own claim. The proposition is a simple one. The application may not be a consent that the contract price of the personalty shall be paid in preference to his lien; but it certainly is a consent that the rental value of that personalty, during the time of the possession by the receiver, appointed at his instance, may have priority to his claim. If the holder of a lien upon the realty does not think that the continued possession of the personalty is a benefit to his lien, he should simply omit the personalty from his bill, and ask the court to take possession of the realty alone. * * * The conclusion is irresistible that, under the circumstances, reasonable rental value was properly allowed as a prior claim to the mortgage indebtedness."

Upon these considerations the decrees of this court in which the cases originated were reversed, "with instructions to strike out all allowances for rental prior to December 1, 1883, the time when the receiver was appointed at the instance of the mortgagors, and to allow the rentals as fixed for the time subsequent thereto."

No suggestion to the contrary having been made at the hearing, I shall assume that the contracts of June 1, 1881, were valid, though, under the decision in *Pennsylvania R. Co.* v. *St. Louis, etc., R. Co.,* 118 U. S. 290, 6 Sup. Ct. Rep. 1094, it would seem clear that they were *ultra vires* and void; and, if so, the petitioner, without regard to the objections that were urged against his right to intervene, has no standing in court. The mortgages of which he is trustee are void if the contracts are. It would follow, further, from the illegality of the contracts, that, if

the receivers are liable for the use of the Indianapolis, Peru & Chicago lines of road, it is not for the price stipulated in the contracts with the Wabash Company, but for the reasonable value of the use, as if no special agreements had been made or attempted; and, indeed, upon the facts of the case, I am convinced that this would be so, even upon the assumption that the contracts, as between the parties, were valid and determinative of their rights. It is true that in *Brown* v. *Railroad Co.*, .35 Fed. Rep. 444, it was held that these receivers, by taking possession of a leased line under the order of the court, "became assignees of the lease, and, as such, liable for the rent;" but a rehearing has been granted in that case, since the report of the master in this was filed, and, while the doctrine of it is, perhaps, the established rule of cases which involve only private rights, the reported decisions show that it has seldom, if ever, been deemed applicable to receivers of railroads who had taken possession of leased roads, or of leased rolling stock found in use upon, or in connection with, the main or trunk lines over which they were appointed; for the reason, I suppose, that the taking of possession of the leased property, ordinarily, is not a purely voluntary act, amounting to an election, on the part either of the receiver or of the court appointing him, but is compelled by that public policy which requires a railroad of established use to be kept in operation. Indeed, it is sometimes a physical necessity. In this case, for instance, an immediate separation of the leased lines from the Wabash roads proper, and from each other, for the purpose of surrendering any of them, with its rolling stock, to its owner, was manifestly impracticable; even if it appeared, as it does not, that the owner was ready and willing to resume possession, and to discharge the duty to the public of keeping the road in operation.

Besides, the laborers who were or had been employed by the Wabash Company, whether upon profitable or unprofitable lines, and, likewise, those who had furnished supplies, had a right to look for their pay to the revenues of the entire system, and not alone to the earnings of the particular subdivision to the operation of which they had contributed. Giving credit, as in the nature of things they must have done, to the company for the time being in charge, they were not required to know the relations to each other of the different branches composing the system, nor bound to inquire into the contracts, whether of consolidation or of lease, by which the combination was effected.

It is to be observed, too, that the leasehold of the Indianapolis Peru & Chicago lines was a valuable part of the assets of the Wabash Company, which the receivers, by virtue of their appointment upon the petition of that company, were necessarily bound to take into possession and preserve, equally with other assets, for disposition according to the rights of claimants, as they should be finally established. The first default in the payment of interest due to the bondholders represented by the intervenor occurred June 1, 1884, just after the appointment of receivers. The intervenor, as trustee, had no right to possession, except upon a default continued for ninety days; so that until the ensuing August 30th the right of the receivers to hold possession and to receive the earnings

in dispute was absolute, aud until after that date it was not in the rightful power of the court, without the consent of parties interested, to have ordered a surrender of possession. If the application for the appointment of receivers had been by a mortgagee of the Wabash Company, instead of the company itself, the applicant might have so framed his bill as to escape responsibility, on the theory of consent, for any action of the court or its receivers in respect to leased roads. In this respect the opinion in *Kneeland* v. *Trust Co.* is quite as explicit as in the recognition of the doctrine, in which the cases following *Fosdick* v. *Schall* agree, that the mortgagee or lienholder, who procures a receivership, thereby consents to the subjection of his interest in the property, of which possession is taken at his instance, to the discharge of liabilities and expenses incurred by the receiver under the proper orders of the court. When, therefore, as in this case, receivers are appointed upon the petition of an insolvent debtor, and there is behind the court no responsible party who has an interest in the property which may be applied to the payment of court debts and expenses, the situation is essentially different, and the administration of the trust and the adjustment of liabilities for past and current expenses, it would seem, must be upon principles somewhat different from what should otherwise govern. It is certainly not true in this case, as counsel for the intervenor have strenuously insisted, "that the court took possession of the leased lines for the benefit of the Wabash Company and its mortgagees and creditors, and not for the benefit of the lessor companies and their mortgagees." On the contrary, under the contracts of lease, the lessor companies and their mortgagees were themselves creditors of the Wabash Company, and the action of the court in appointing receivers, upon the motion of that company, was necessarily, in law and in equity, as much for their benefit as for the benefit of any other mortgagee or creditor. And it follows that the rights of all the parties must be determined and enforced with due reference to the respective contracts and mortgages under which they claim, or out of which their rights have arisen.

The general mortgage executed by the Wabash Company, on June 1, 1880, to the Central Trust Company and Cheney, as trustees, contained an "after-acquired property" clause, by force of which it covered the interest of the Wabash Company in the Indianapolis, Peru & Chicago lines, acquired under the contracts of June 1, 1881; and according to *Dow* v. *Railroad Co.*, 124 U. S. 652, 8 Sup. Ct. Rep. 673, and other cases, if the Wabash system, as a whole, had been earning more than the expenses of operation, when the trustees of that mortgage filed their cross-bill and asked the appointment of receivers in the interest of their trust, they would have become entitled thereafter to that surplus, even though derived, in whole or in part, from these leased lines, unless, before it had accrued, the intervenor, by a re-entry or by demanding possession for condition broken, had established his right thereto for the use of his *cestuis que trust;* but, there having been a deficit instead of the supposed surplus, the trustees of the general mortgage, by filing their cross-bill, acquired no interest in the earnings either of the entire system or

of any subdivision; and the excess of the earnings of the Indianapolis division, so long as it remained a rightful part of the system, belonged necessarily to the receivers, to be applied to current operating expenses of the system; and, under the orders of the court, to the payment of preferential liabilities which had accrued before the receivers were appointed. Until August 30, 1884, that was under the contracts unconditionally so. After that time, by demanding possession, the intervenor might have terminated the right of the receivers in this respect, and have established his own; but without such demand, or some equivalent fact, it would seem clear that he had no claim upon the earnings, though embraced by express terms in his mortgages. Sage v. Railroad Co., 125 U. S. 361, 8 Sup. Ct. Rep. 887, and cases cited.

It is insisted, however, that by certain orders of the court, and especially by that of April 16, 1885, the court gave assurance that, "when any subdivision earned a surplus over expenses, the rental or subdivisional interest would be paid to the extent of the surplus;" and that by reason of this the intervenor was under no necessity of making a demand for possession in order to establish the right which he now asserts. But, if this were conceded, it would still be apparent that he acquired no interest in the earnings which accrued before that order was made, and that on this account alone there would have to be a large reduction in the master's computation of the amount due. The order of the court, however, will not bear the construction insisted upon. It contains, besides the quotation given, the further clause: "There will be no modification of the order heretofore entered concerning receivers' certificates, but all equities respecting them, as between various subdivisions, will be adjusted in the final decree," etc.; and upon the entire record it is evident that the court did not intend an unconditional promise or assurance that the surplus earnings of a subdivision or leased line should, in any and all events, be paid as rental or interest to the owners or mortgagees thereof. On this point it is enough to refer to the decision of Justice BREWER while upon the circuit bench, as reported in Central Trust Co. v. Wabash, etc., Ry. Co., 38 Fed. Rep. 63, where the question was substantially the same as here. The intervenor never obtained a specific order of the court for the payment to him, or upon the mortgage debts which he represented, the net earnings of the Indianapolis, Peru & Chicago lines, though the quarterly reports of the receivers all the while showed receipts from that source sufficient for the purpose, which in his relations to the case he must have known were being expended in the operation of the system, or in the payment of preferential debts antedating the receivership, and that, if ever refunded, it would have to be done out of the corpus of the Wabash property at the expense of its mortgagees. It may be remarked in this connection that, when the intervenor came to present his claim to this court for adjudication, neither in his original nor supplemental petition did he assert or suggest that his demand rested upon the orders of the court, in the sense now urged, or had any better equity on that account.

If, upon the filing of their cross-bill, the court had granted the motion of the trustees of the general mortgage for the appointment of

receivers in their interest, or had sustained any of the like motions which they afterwards made, they would have become responsible, I suppose, for the conduct of the receivership from that time, as if the appointment had been made upon their motion in the first instance, and so, perhaps, the interests represented by them might have been subordinated to the intervenor's claim thereafter accruing; but, the court having denied all their efforts to obtain charge of the receivership, it cannot be said that any order of the court rests upon their implied consent; and if the bonds secured by the general mortgage, or by the mortgages of 1867 and 1879, can be postponed in favor of the intervenor's demand, it must be because that demand is somehow to be deemed one of the "obligations" which in *Kneeland* v. *Trust Co.*, *supra*, are said to be "burdens necessarily upon the property taken possession of," "irrespective of the question who may be the ultimate owner," "or who may have the preferred lien, or who may invoke the receivership."

Reference has been made to *Miltenberger* v. *Railway Co.*, 106 U. S. 286, 1 Sup. Ct. Rep. 140; and it appears that in that case the rental for the use of a leased line of road by the receivers therein appointed was ordered paid out of the proceeds of sale in preference to mortgage debts. But the original lease in that case was for a short term, with rights of extension or abandonment upon short notice, and it is fairly inferable that the successive receivers were deemed to have continued in possession of the leased line with the consent of the mortgagees whose rights were postponed. When, however, as in this case, the lease is for a long term, the practical result is an incorporation of the leased line into the body and ownership of the principal line, and in no just sense is the value of the use of one, more than of the other, an operating expense of the combination. If so, a mortgage upon a railroad, instead of having stable value according to the fixed principles of law and equity applicable to mortgages upon real estate, is subject to displacement at the will of the mortgagor, as well for his own interest as for the benefit of other parties to contracts of subsequent date, which, upon principles hitherto supposed to be established, should be subject to existing and recorded mortgage liens. The Wabash Company, by making the contracts of June 1, 1881, certainly neither conferred nor acquired any rights which, in respect to the mortgaged properties, were not subject to the mortgages theretofore made; and the court, by appointing receivers at the instance of that company, did not, as I conceive, acquire power to change the order of priority in that respect.   In fact, while those contracts are in the form, and, when considered by themselves, may be entitled to the name, of leases, the Cutting contract shows that the real purpose of the transaction was a sale of the Indianapolis, Peru & Chicago roads to the Wabash Company for the price evidenced by the bonds which that company delivered to the so-called lessors.   The interest on those bonds may have been regarded by the parties as equivalent to a fair annual rental of the leased roads and equipment until at the end of the term the intended sale should be consummated, but, even if so treated, it was not, under the circumstances, I think, an operating expense of such character as to

be entitled to equitable preference over the mortgage liens of prior date.

Counsel for the intervenor, referring to the decision upon the intervening petition of Gilman and others, in *Central Trust Co.* v. *Wabash, etc., Ry. Co.*, 34 Fed. Rep. 259, say:

"It is difficult to understand how the court could bring itself to believe that either law or equity would sanction the taking by the court of the net earnings of leased lines, held by the court for the benefit of the Wabash Company and its bondholders and creditors, and apply them to the payment of either past or current operating expenses of the lines of railway owned by the Wabash Company, leaving the rent of the leased lines making such net earnings unpaid."

The strength of this statement is largely in the erroneous assumption, already pointed out, that the receivership was for the special benefit of bondholders and creditors of the Wabash Company, as distinguished from the mortgagees and creditors of the lessor companies. There is in the statement the further implication, necessary to the force of the argument, that there has been an improper diversion of earnings "to the payment of either past or current operating expenses of the lines of railway owned by the Wabash Company," which ought to be made good at the expense of the mortgagees of that company,—a proposition which, I believe, embraces error both of law and of fact; of fact, because the master's report does not show, nor has the evidence been pointed out which shows, that the excess of expenses of operation over earnings of the entire system arose "upon lines of railway owned by the Wabash Company," and not, in whole or in part, upon leased lines, nor that the net earnings of the Indianapolis, Peru & Chicago lines were expended for any particular purpose, or in such way as to be traceable. The argument at the hearing, as it was understood, proceeded on the assumption or concession that those earnings were mingled with the general income of the system, and were expended in the payment of current expenses or in the discharge of preferred liabilities, which had accrued to a large amount before the receivers were appointed; the report showing that upon that class of liabilities the receivers had paid as much as $4,416,-797.13, and that under the orders of the court, at St. Louis, they had "disbursed all the funds which came to their hands as such receivers;" and, other than in this general way, it was not claimed nor shown that the earnings in question were applied to the benefit of the mortgagees of the Wabash Company; and, this being so, there has been no diversion which, according to *St. Louis, etc., R. Co.* v. *Cleveland, etc., Ry. Co., supra,* the mortgagees can be required to make good. But for the authoritative statement in that case to the contrary, I should have been of opinion that payments upon a first mortgage are a benefit to the holders of subsequent mortgages or liens so direct and certain as to constitute a diversion, if made out of earnings, which a court of chancery would charge upon the property, or upon the proceeds of a sale upon foreclosure of the second or later mortgage,—the fund produced being presumably larger by the amount of the payments upon the prior lien; but, since that is not so, much clearer is it that there has been no diversion of the earnings in

question here which can be charged upon the Wabash roads in preference to the rights of the mortgagees; and if the intervenor, or those on whose behalf he sues, would recover the money, they must seek it of those who received it. If those earnings had been stolen or otherwise lost, or if, through mismanagement of the receivers, they had not accrued, the mortgagees would not be chargeable; and so it must be in respect to any misapplication thereof not made at their instance, or for their benefit, within the meaning of the rule declared by the supreme court.

In this connection it is proper to refer to the proposition of counsel "that the Wabash Company did not owe any debts for operating expenses incurred by the company within six months next prior to the date of the appointment of Humphreys and Tutt as receivers, simply because the Wabash, St. Louis & Pacific Railway Company did not operate any railway during that six months, or any part of it; the St. Louis, Iron Mountain & Southern Railway Company—a perfectly solvent corporation—having possessed and operated the entire Wabash Railway and its leased lines during that six months under the lease made to it by the Wabash Company on April 10, 1883." If the fact were as stated, and the inference justified that the court committed a great wrong or error in recognizing the debts of that period as debts of the Wabash Company, entitled to payment out of the earnings of the system under the receivers, it is clear that the wrong cannot be righted at the expense of the mortgage creditors. To do so would be only to add to the original injustice done them, upon this theory, by the issue of receivers' certificates for a large part of those debts, and making the certificates a prior charge upon the mortgaged property. The fact, however, is that by the lease referred to the Iron Mountain Company took possession of the Wabash system, under an agreement to operate it, to receive its income and earnings, and apply them, after paying operating expenses, upon the obligations of the Wabash Company, but became itself in no way personally bound to pay or contribute to those expenses. On the contrary, the Wabash Company bound itself, and afterwards executed a mortgage to secure the obligation, to repay to the Iron Mountain Company any sums which it should expend for the benefit of the Wabash Company under the lease. The debts, therefore, which accrued, during that arrangement, on account of operating expenses, were the debts of the Wabash Company, and were properly treated as entitled to payment out of earnings or income in the hands of the receivers. Whether the receivers' certificates, if issued without the consent of the mortgagees, were a proper charge upon the *corpus* of the property payable before the mortgages thereon is quite a different question, but, in view of the opinion and rulings in *Kneeland* v. *Trust Co., supra,* as well as upon principle, it is a question which it would seem should be resolved in the negative. The rental of cars is not less distinctly an operating expense than the rental of leased lines of road, certainly, and yet in that case the claim for the use of rolling stock, during the four months next preceding the appointment of receivers upon motion of the mort-

gagees, was rejected; and like claims which accrued after that appointment were allowed, only because the mortgagees in their bill had asked the court "to take possession, through its receivers, of both the real and personal property." If, however, such rentals, accruing during a receivership, were "burdens necessarily upon the property taken possession of, * * * irrespective of the question who invoked the receivership," the claims ought, on that ground,. to have been paid for the whole time, including the receivership obtained by the judgment creditor, as well as that of the mortgagees; the consent, express or implied, of the mortgagees being on that theory immaterial. The claims which accrued under the first receivership were, of course, not less meritorious because the road was in the custody of the court than if the railroad company had been in charge; and, under what in this circuit is called the "six-months rule," they would certainly have been entitled to payment if there had been in the hands of the receivers a fund derived from earnings of the road; and the court's refusal to sanction the payment thereof out of the proceeds of sale of the property on decree of foreclosure would seem to mean necessarily that, without the consent of mortgagees, the rental of rolling stock, though used by receivers under the sanction of the court, cannot be paid in preference to prior mortgage debts. It will not do to say, as was suggested in argument, that this decision rests in any degree on the ground that the owners of rolling stock had retained a lien upon the property, and that, having that security, they were not entitled to ask relief on other equitable grounds. If there were force in the suggestion, it would be of equal potency in the present case, where the lessors took a like security upon the leased property, whereby, upon any default of the lessee, their trustees were authorized to resume possession. In neither case, however, can it be said that the claim presented was a secured claim. The contracts under which the railroad company obtained possession of the rolling stock were not treated as binding upon the parties; the rentals were estimated upon the basis of fair value, as if no contracts had been made; and in no proper sense can be said to have been secured by the reserved right of the vendors to resume possession. That right could not have been exercised against the receivers, without leave of court. The same is true in respect to the intervenor's rights as trustee. His power to take possession might have been employed, under the sanction of the court, to stop further use by the receivers of the roads in which he was interested, but it constituted no sort of security for the payment of rentals already accrued. The conclusion reached that the claim presented ought not to be made a charge upon the interests of the mortgagees or of the purchasers at the foreclosure sales, the consideration of other questions is not necessary. It follows that the master's report should be set aside, and the intervenor's petition dismissed.