PARK v. NEW YORK, L. E. & W. R. CO. et al.

(Circuit Court, S. D. New York. October 31, 1894.)

RAILROAD COMPANIES—RECEIVERS—PAYMENT OF INTEREST ON BONDS—PRIORITY.
  Upon a request for instructions by the receivers of defendant, an insolvent railroad corporation, as to payment of interest on bonds, it appeared (1) that one series of bonds was issued by defendant; and secured by a mortgage of stocks and bonds which had a market value largely in excess of the amount of bonds issued, and produced an income in excess of the interest on such bonds, and which secured to defendant control of properties forming integral and essential parts of its system, which would be lost if such stocks, etc., were sold under foreclosure; (2) that another series consisted of first mortgage bonds of a road constituting a link of vital importance in defendant's system, the loss of which by foreclosure would greatly depreciate the value of the rest; (3) that another series consisted of like bonds of another road, of great value to defendant's system; (4) that another series consisted of bonds secured by a deposit of four sets of past-due coupons of defendant's second consolidated mortgage bonds, which coupons, under the terms of that mortgage, were superior in lien to coupons of the same bonds subsequently maturing. Held, that the coupons of each of these series of bonds should be paid by the receiver, out of any available funds, before payment of coupons of the said second consolidated mortgage bonds maturing during the receivership, although such second consolidated mortgage was prior in date to all the aforesaid mortgages, and notwithstanding there was a question as to whether the lien of such second consolidated mortgage upon the stocks and bonds covered by the first-mentioned mortgage was not superior to the lien of that mortgage, which question could not be determined in this suit.

This was a proceeding by Trenor Luther Park against the New York, Lake Erie & Western Railroad Company for the appointment of receivers and for other relief. John King and John C. McCullough were duly appointed receivers, and in August, 1893, the Farmers' Loan & Trust Company petitioned the court for leave to intervene as a party defendant, and an order was made to that effect. The cause is now before the court on petition by the Farmers' Loan & Trust Company praying for an investigation by the court, and an order respecting the payment of certain demands against the railroad company by the receivers.

Frederic B. Jennings, for receivers.

Herbert B. Turner and Frederick Geller, for Farmers' L. & T. Co., for motion.

James C. Carter, for second consolidated bondholders.

Francis L. Stetson, for certain second consolidated bondholders.

LACOMBE, Circuit Judge. Receivers of the defendant railroad company were heretofore in this action appointed, and are now administering their trust. The defendant trust company is the mortgagee in trust under various mortgages covering property of the defendant railroad company. Among these mortgages is one known as the "New Second Consolidated Mortgage," dated October 5, 1878, under which bonds to the amount of $36,097,400 are outstanding. The coupons falling due on this mortgage since receivers have been appointed have not been paid, the receivers not being in

receipt of sufficient net income to meet them; but proceedings to foreclose have not been instituted, as the mortgage provides therefor only in the event of default on each of six successive coupons.     The trust company now presents a petition, accompanied by a letter received from the holders of a large number of these bonds, in which letter it is stated that there is reason to apprehend the payment by the receivers of interest installments soon to grow due upon certain bonds of the defendant company, and companies owned or controlled by it, which are subsequent and inferior in point of time or of lien, or of both, to the bonds secured by the said second consolidated mortgage.     The petition prays that the court will make such investigations as may be proper, and will make such order as to the payment of the various installments of interest as the circumstances may demand.     A supplemental petition presents another letter received from the holders of $27,000,000 of the second consolidated mortgage bonds, urging the trust company to impress upon the court the importance of instructing the receivers to pay promptly at maturity such interest on bonds of four series therein named, and which are secured by mortgages subsequent in date to the said second consolidated.     Counsel representing both sets of second consolidated bondholders have been heard on the argument.     The receivers, in answer to the petition, set forth certain facts, and also submit the question to the court with a request for instructions.     The bonds upon which it is alleged that installments of interest are about to be paid are these:

No. 1. Collateral trust bonds of defendant railroad, $3,344,000, 6%.  Mortgage dated November 1, 1882.  Coupons due November 1st and May 1st.

No. 2. First mortgage bonds, Chicago & Erie Railroad Company, $12,000,-000, 5%.  Mortgage dated August 21, 1890, and guarantied by defendant railroad.  Coupons due November 1st and May 1st.

No. 3. First mortgage bonds, New York, Lake Erie & Western Coal & Railroad Company. $3,000,000, 6%.  Mortgage dated May 15, 1882, and guarantied by defendant railroad.  Coupons due November 1st and May 1st.

No. 4. Income bonds of defendant railroad, $508,008, 6%.  Coupons due December 1st and June 1st.

No. 5. Funded coupons bonds of 1885, $4,031,000, of defendant railroad, 5%.  Mortgage dated November, 1885.  Coupons due December 1st and June 1st.

As to No. 4,—the income bonds,—it appears that no interest upon them has been earned, and that none is to be paid.  They are therefore withdrawn from further consideration.  The coupons on Nos. 1, 2, and 3 fall due November 1st, and the court intimated upon the argument that it might not be possible, within the brief time remaining before that day, to examine and dispose of all the points raised with regard to them.  Upon investigation, however, it appears that the questions now presented for determination are not at all as comprehensive as was then supposed, and there is no reason why the answers to them should be further delayed.

No. 1.  The Collateral Trust Bonds.  In 1882 the defendant railroad, being the owner of stocks and bonds of various corporations, pledged them to the United States Trust Company as security for a series of bonds issued by defendant.  The various stocks and bonds thus pledged were specifically enumerated in the indenture of mort-

gage, and they were delivered to the United States Trust Company, the railroad reserving the power of voting on such stocks and bonds, so as not to lose its control of the subsidiary corporations. In case of six months' default in payment of interest on the collateral trust bonds, the United States Trust Company was authorized to. sell the pledged securities at public auction upon three months' notice. The amount of collateral trust bonds outstanding is $3,344,000. The par value of the stocks and bonds pledged for their payment is about $8,000,000, and their actual value not less than three times the amount of collateral trust bonds outstanding. The pledged stocks and bonds are paying interest, annually, in excess of the interest due on the trust bonds by over $50,000. It appears, moreover, that in some instances such pledged stocks secure to their owner the control of property which is, and has been for many years, an integral part of the Erie Railroad system. The anthracite coal lands and the bituminous coal lands, from which the road draws a large part of its supply of coal, are owned by corporations, the entire capital stock of which is included among the securities thus pledged. It is plain that if, upon default in the payment of the interest falling due on the collateral trust bonds, the trustee should, as the mortgage provides, declare the whole principal due, and sell the pledged securities in the open market to the highest bidder, the value of the property which was placed in the hands of these receivers to be conserved for the benefit of all the creditors would be most seriously impaired. Certainly, such a catastrophe should not be allowed to overtake the property while in the hands of the court if it is avoidable. It is urged, however, that no such disastrous consequence could result from a failure by the receivers to meet the interest coming due on collateral trust bonds. The second consolidated mortgage, which was made four years before these securities were pledged, enumerates not only the real estate, but also the estate, right, title, and interest of the Erie Company in various corporations expressly named, and, in general terms, "all manner of mixed and personal property, of whatever nature or description the same may be, at the date of these presents owned or possessed by said party of the first part, or that may at any time hereafter, during the continuance of this trust, be acquired by said party of the first part." By the terms of the mortgage, these securities, subsequently pledged to the United States Trust Company, were left in the possession of the railroad company, with a power of sale or exchange which is set forth in much detail in article 5 of the indenture. It is contended that the second consolidated mortgage subjected all the securities subsequently transferred to the United States Trust Company to a lien superior to any obtainable by the latter company as trustee under the collateral trust mortgage. Hence, it is argued that no title, save, perhaps, to an equity subordinate to the consolidated mortgage, could be conveyed by any attempted sale under foreclosure of the collateral trust mortgage. In other words, the question presented is, what are the respective rights of the holders of these two mortgages in the stocks and bonds enumerated in the collateral trust indenture? Manifestly, that is a question which this court should not now

answer. The holders of the collateral trust mortgage are not before us. The court is uninformed as to all the facts, and unenlightened by the arguments of all the parties in interest. All it is necessary or proper to determine now is whether the receivers should default and allow foreclosure of the collateral trust mortgage, on the chance that, when such foreclosure proceedings are instituted, the court before which the main question may come will hold that the holders of such mortgage acquired no right to sell out the securities enumerated therein, and with the certainty that, should such court reach an opposite conclusion, the property which was placed in the hands of these receivers to be preserved intact, as far as might be possible, for all the creditors, secured and unsecured, in the proper order of their priorities, would be most seriously impaired. The receivers should take no such risk. To do so upon speculations as to the future decision of some other court would be simple recklessness. The receivers should, if they have the money, pay the interest, and thus secure the pledged stocks and bonds beyond any peradventure, as assets valuable in themselves, and still more valuable because they preserve the control of subsidiary railroads, steamboats, coal fields, and other appurtenances essential to the system as a whole. The interests of the second mortgage bondholders themselves, quite as much as those of all other creditors, call for such action.

No. 2. First Mortgage Bonds Chicago & Erie Railroad. This road is part of the Erie system. It appears from the reports that it is not being operated at a profit. A statement submitted by the receivers seems to indicate that, were it not for the fact that this subsidiary road is charged with a disproportionate share of certain expenditures, that result would not appear. All such questions of bookkeeping, however, may be disregarded. The road in question is 269 miles in length, extending from Marion to Chicago. It is an integral part of the main line of the Erie Railway, and is the line by which it enters Chicago and secures the terminal facilities of that great railroad center. It must be assumed that, in the event of default upon these first mortgage bonds, foreclosure would ensue, and the Chicago & Erie Railroad be sold out to the highest bidder. To allow this to happen, if they have money in hand to prevent it, would be most reprehensible improvidence on the part of the receivers, unless it can be shown that the depreciation in the value of the whole property consequent upon discarding its present communication with Chicago may be made good in some other way. Upon the argument it was intimated that a reference might be ordered touching these bonds and those of the coal and railroad company, next to be considered, but upon further examination of the papers before the court it seems premature to make any such order. When any facts are presented tending to show that the loss of these 269 miles of road will not impair the value of the property, it will be time enough to send it to a master to take testimony, and report at a hearing where all parties creditor, whether secured or unsecured, may have an opportunity to discuss the question.

No. 3. New York, Lake Erie & Western Coal & Railroad Company

Bonds. The situation here is about the same. The road in question is the main line which connects the Erie system with its coal fields. Over this line, without payment of any freight, it hauls the coal which it uses to drive its engines on other parts of the system. The same remarks apply to these securities, and the same disposition should be made of them. Until further facts appear, the receivers should pay interest accruing on both these sets of bonds.

No. 5. Funded Coupon Bonds of 1885. In the years 1884 and 1885 the defendant railroad defaulted on the payment of four successive coupons of the second consolidated mortgage bonds. These coupons were deposited by their holders with the Farmers' Loan & Trust Company, as a trustee, to be held, "with all the rights, lien, remedies, and security incident thereto," in trust for the benefit of, and as collateral security for, a new issue of bonds, known as the "Funded Coupon Bonds of 1885," and taken by the holders of the coupons in exchange or substitution therefor. The funding coupon indenture, under which these funded coupon bonds were issued, expressly provides that all the rights, remedies, lien, and security incident to the coupon shall remain in full force for the purpose of obtaining or enforcing payment of said funded coupon bonds. The same indebtedness is represented both by coupons and bonds. By the terms of the second consolidated mortgage it is expressly provided that each due coupon must be paid in full before part payment of any coupon subsequently maturing. Upon winding up the affairs of the defendant railroad company, therefore, these coupons would have to be paid in full before any subsequent installment of interest or the principal of the second consolidated bonds. The debt, therefore, represented by these coupons and by the funded coupon bonds, is superior in point of lien to that represented by subsequent coupons of the second consolidated bonds, and there is no reason why the receivers should be instructed not to pay them, if there be net income available for that purpose.

NOTE. For prior hearing on motion of the New York, Pennsylvania & Ohio Railroad Company, as petitioner, to instruct the receivers of the defendant as to the making of certain payments to petitioner, see 57 Fed. 799.