### LLOYD et al. **v.** CHESAPEAKE, O. & S. W. R. CO.

(Circuit Court, D. Kentucky. January 19, 1895.)

1. EQUITY—PRACTICE—SECOND RECEIVERSHIP.

    Where a suit has been brought against a railroad company by a judgment creditor, and receivers have been appointed in that suit, and another suit is brought by the trustees of a mortgage for foreclosure, independent receivers should not be appointed in the latter suit, but the proper practice is to extend the receivership in the first suit to the second, and to consolidate the two suits.

2. RAILROAD FORECLOSURE—RECEIVERS—PAYMENT OF INTEREST.

    H. brought suit against the C. R. Co., and obtained the appointment of receivers to impound its earnings for the benefit of claims held by him. The trustees of a second mortgage began suit against the railroad company for foreclosure, and petitioned the court to direct the receivers to pay the interest on bonds secured by a first mortgage, in order to prevent a foreclosure of that mortgage. This application was resisted by the first mortgage bondholders, claiming a right to have default suffered, and to be placed in a position to foreclose; and also by U., as trustee, holding a large mount of second mortgage bonds, but holding them in the interest of H. and two other railroad companies, who held a much larger amount of first mortgage bonds, and were also seeking to control and reorganize the C. R. Co. It appeared that the earnings of the road were amply sufficient to pay the interest on the first mortgage, besides operating expenses, and that it was greatly to the interest of the holders of the second mortgage bonds not more largely interested in the first mortgage, and to that of the other creditors of the road subsequent to the first mortgage, that a foreclosure of that mortgage should be prevented. *Held,* that the

receivers should be directed to pay the interest on the first mortgage bonds, and, if necessary, to borrow money to anticipate income for that purpose.

This was a suit by Joseph P. Lloyd and James B. Hawes, trustees, against the Chesapeake, Ohio & Southwestern Railroad Company for the foreclosure of a second mortgage. Plaintiffs move for directions to the receivers in possession of the road to pay interest on the first mortgage bonds.

December 28, 1893, C. P. Huntington, upon a bill and amended bill filed by him against the Chesapeake, Ohio & Southwestern Railroad Company, obtained appointment of receivers. The claims asserted by him were a judgment, certain equipment notes, and a majority of the second mortgage bonds. At this time there was no default in interest on the first mortgage bonds. In December, 1894, the receivers were directed to pay the interest which fell due on the first mortgage bonds February 1, 1894. Subsequently application was made to direct the receivers to pay the interest on the first mortgage bonds which fell due August 1, 1894, as by failure to pay interest for six months the holders of a majority of these bonds could precipitate their maturity. January 17, 1895, the trustees in the second mortgage filed an original bill, and on January 19, 1895, on notice to all parties in interest in this and the other cause, asked for an independent receivership, and that the receivers should be directed to borrow enough money to pay the interest which fell due on the first mortgage August 1, 1894.

George W. Norton was, on his own application, made a party complainant, as representing a large number of the second mortgage bonds.

Gibson & Marshall and Tracy, Boardman & Platt, for complainants, Lloyd and Hawes, trustees second mortgage.

Humphrey & Davie, for G. W. Norton, intervener.

Bullitt & Shield and Pirtle & Trabue, for defendants Pardee and Horsey, trustees first mortgage.

W. O. Harris, for defendant United States Trust Co., trustee.

Helm & Bruce, for defendant L. & N. R. Co.

Chas. S. Grubbs, for defendant receivers.

LURTON, Circuit Judge (orally). The first question arises upon the bill of foreclosure filed by Joseph P. Lloyd and James B. Hawes, trustees under a second mortgage made by the Chesapeake, Ohio & Southwestern Railroad Company. I think there ought not to be an independent receivership under this bill. That would require the discharge of the receivers heretofore appointed, and the winding up of that receivership, for there could not be two independent receiverships of the same property. The proper practice is to extend the receivership already in existence to this second foreclosure suit, and that the two cases be consolidated, and heard together. A decree to this effect will therefore be drawn.

The next question is, to my mind, a very simple one. It is presented by the petition of the trustees under the second mortgage, asking that the interest which fell due on the first mortgage bonds August 1, 1894, be paid by the receivers. An application of like character was made by the same trustees some few days since, but before they had filed their foreclosure bill, which application I will consider along with the one made since the filing of their bill, against the Chesapeake, Ohio & Southwestern Railroad Company. On the

former argument it was insisted that the original bill of Huntington was not a general creditors' bill, but was a bill for no other object than the application of surplus income to the discharge of his judgment debt.   It was also insisted that his supplemental and amended bill did not impound the earnings for the benefit of the second mortgage bondholders, and that, therefore, they had no standing in that cause from which to insist upon the application of surplus earnings in payment of interest upon the first mortgage bonds.   That question I took under consideration.  Before deciding it, the difficulty thus suggested had been removed by the foreclosure bill which has since been filed by the second mortgage trustees.   I had then, as I have now, a very strong impression that under the original and supplemental bills of Huntington the earnings were not impressed or impounded exclusively in favor of any one class of creditors, and that the effect of Huntington's amended bill was to obtain a receiver upon the bill filed by him in his character as a general unsecured creditor, as a large holder of second mortgage bonds, and as the owner of several claims for supplies and material furnished alleged to be entitled to a preference over both mortgages.   It is unnecessary to now decide as to the correctness of that impression, for any order which I shall make respecting the payment of the interest in default on the first mortgage bonds will be confined to the application of the future earning of the property while in the hands of the receivers under both bills.

The parties applying for a direction to the receivers to pay the August interest upon the first mortgage bonds are the trustees under the second mortgage, and George W. Norton, a holder of second mortgage bonds, who has been permitted to intervene.   The ground upon which the application is made is this:   That in the mortgage securing the first series of bonds issued by the Chesapeake, Ohio & Southwestern Railroad Company there is a provision whereby the maturity of these bonds may be precipitated if interest shall continue in default for a period of six months.   An installment of interest fell due August 1, 1894, which, if not paid by the 1st day of February, 1895, may result in maturing the six millions of bonds known as the "First Mortgage Bonds."   The petitioner trustees applying for this order represent that the vital interests of the second mortgage bondholders and other creditors subordinate to the first mortgage require that the maturity of the first mortgage bonds shall be avoided by an immediate payment of the interest now in default. The trustees under the first mortgage were made parties defendant to Huntington's original bill.   No relief was sought against them, and, indeed, none could have been had.   The railroad company was not in default with respect to either the principal or interest secured under the first mortgage.   The first mortgagees were, therefore, not necessary parties, and only proper parties for the purpose of ascertaining the amount of their debt and the extent of their lien. Neither Huntington's bill nor that of the trustees of the second mortgage seeks to sell the property clear of the first mortgage, but, upon the contrary, the object all along has been to bring the prop-

erty to a foreclosure sale subject to the first mortgage. Neverthe-less, the trustees under the first mortgage have very strenuously objected to the application of either the past-due or future earnings to the payment of the interest due on these first mortgage bonds. The United States Trust Company, likewise a defendant to the original bill, by intervention has joined in the objection to the pay-ment of this interest. The attitude of that trust company seems very extraordinary in view of the fact that it holds in trust something more than two millions of the second mortgage bonds. It seems very remarkable that the holder of a majority of the second mort-gage bonds should oppose the payment of interest upon the first mortgage bonds. Its attitude is, however, fully explained by an examination of the terms of the trust under which it holds the sec-ond mortgage bonds mentioned. From that deed of trust, which has been exhibited here by the counsel representing that trust company, it appears that C. P. Huntington sold to the Illinois Central Railroad Company a large majority of the second mortgage bonds and a con-trolling interest in the stock of the Chesapeake, Ohio & Southwest-ern Railroad Company; that at the same time he sold to that com-pany his judgment for over $80,000 against the said Chesapeake, Ohio & Southwestern Railroad Company, and a number of claims asserted to be entitled to priority over both mortgages, aggregating altogether some two millions of dollars. It further appears that thereafter the Illinois Central Railroad Company contracted to sell all these interests to the Louisville & Nashville Railroad Company, and that, pending the completion of this latter sale, all these claims were transferred in trust to the United States Trust Company; and that a committee called a "reorganization committee" was created by these two railroad companies, which committee consisted of two representatives of the Illinois Central Railroad Company, two rep-resentatives of the Louisville & Nashville Railroad Company, and another, the representative of C. P. Huntington. By a telegram from the United States Trust Company to the counsel representing it in this cause, Judge W. O. Harris, and which has been read to the court by its counsel, it appears that the trust company wishes this court to understand that its action in resisting the application of the trustees under the second mortgage for the payment of the interest in default on the first mortgage has been dictated by the majority of the reorganization committee aforesaid. Indeed, it further ap-pears, by an admission made at the bar by Mr. Trabue, that the Illinois Central Railroad Company is now the holder and owner of five-sixths of the entire issue of the first mortgage bonds. From these facts it is very apparent to the court that the resistance of the trustees under the first mortgage, and of the United States Trust Company, trustee under the reorganization trust, to the pay-ment of the defaulted interest on the first mortgage bonds, has been dictated by the supposed interests of the Illinois Central Railroad Company. It is justly to be inferred that the interest of the Illinois Central Railroad Company in bringing about a maturity of the first mortgage bonds is greater than its interest as the owner

of second mortgage bonds; and that the United States Trust Company, as trustee, holding the securities belonging to the Illinois Central Railroad Company, is dominated by the interests of the Illinois Central Railroad Company. It is an indisputable fact that to prevent a maturity of the principal of the first mortgage bonds is a matter of vital interest to the creditors of the railroad company whose claims are subordinate to that of the first mortgage bonds. Those interests are the active interests represented both by the Huntington bill and the bill filed by the trustees of the second mortgage. These interests have procured the appointment of a receiver, and these interests have impounded the earnings. During the time that this road has been in the hands of receivers more than $200,000 of claims entitled to preference have been paid. The interest on the first mortgage bonds which matured in February, 1894, has been paid. The operating expenses have been made, and the road has been kept in reasonably good repair. The receivers' reports show that for several months past the net earnings have steadily increased, and that the earnings over and above operating expenses are now estimated at $800,000 per annum. In view of the great business depression which has prevailed during this receivership, the earnings of this property have been remarkably large, and the net earnings clearly indicate great economy and wise management by the receivers, Gen. John Echols and St. John Boyle. This large surplus over operating expenses must, of course, be first applied to necessary repairs and betterments, and to the payment of the rentals upon the Cecilia branch. After this has been done, there will remain a sum more than sufficient to keep down the interest upon the first mortgage bonds. These facts demonstrate to my mind that the interests which have obtained this receivership have a real and substantial value, and that this property, if sold subject to the first mortgage bonds, will produce a sum abundantly sufficient to demand the utmost exertion of the court to preserve subordinate interests from the fatal consequences of a maturity of so large a debt as that evidenced by the first mortgage bonds.

It has been argued that the surplus earnings, after paying operating expenses, should be applied in discharge of the pending claims which are, by reason of their character, entitled to priority over the entire bonded indebtedness of the debtor railroad company. There are two answers to this: First. That each and every one of the claims asserted as preferential claims are litigated. Second. If it be assumed that these claims shall be established, and that they shall be held as claims entitled to preference over both the first and second mortgage, they can only be paid by making default in the interest due upon the first mortgage bonds. The result would be that, if the entire earnings of the road are applied to discharge claims entitled to preference over the first mortgage, it would be at the expense of the accumulation of interest upon the first mortgage. What the first mortgagees would gain by having claims paid which are ahead of them they would lose by an accumulation of interest upon their bonds. Thus it seems to me that the first mortgage bondholders are not interested; that it is the same thing to

them, upon the assumption that this property is worth no more than the principal of their debt, whether the surplus earnings be applied to the payment of preferential claims or to the payment of interest as it matures upon their bonds. What they would gain in one direction they lose in another. But for the first mortgage bondholders it has been argued that by an application of the earnings to the payment of their interest they would lose the right to foreclose their mortgage. This argument seems to me utterly barren of equity. Their debt is not due, and they have no right of foreclosure so long as interest is not in default. To say that by applying earnings to the payment of their interest, and thereby preventing foreclosure, is to work an injury to them, is an indefensible position. The first mortgagee is not an actor in this litigation. The debtor railroad company, by paying the interest as it matures, can prevent a foreclosure of the first mortgage. That company makes no objection to the application of the earnings in the hands of the receivers to the payment of the unquestioned debt due from it, and an undoubted first lien upon its property. Holders of second mortgage bonds have no ground whatever to object to the payment of that interest, because that interest is, in any event, to be paid before they can receive anything from the corpus of the property. But on this record and upon these pleadings I must assume that the trustees under the second mortgage are fully and honestly representing the best interests of their second mortgage bondholders. The class of creditors entitled to be regarded as second mortgage bondholders are truly and fully represented by the application of the trustees to apply the surplus earnings to the discharge of a debt prior in lien to their own, especially when a failure to pay off a comparatively insignificant amount of interest will operate to precipitate the maturity of six millions of debt. The claims which are pending, and which insist that they are entitled to priority over both the mortgages, are not and cannot be affected, although their claims shall be sustained as preferential claims. If they are not paid out of the earnings, they are entitled to be paid out of the corpus. They therefore have no substantial interest in supporting an objection to the application of future earnings to prevent a default on the first mortgage bonds.

General creditors, having no security for their debts, have a very deep interest in preventing a maturity of the first mortgage. If the first mortgage shall be foreclosed, preferential claims must be first paid; the first mortgage bonds must next be paid; the second mortgage bonds then paid, and the surplus only would be applicable to the payment of such unsecured claims. It seems to me, therefore, that the only interest which is to be in any degree affected by the application of future earnings to the payment of past-due interest on the first mortgage bonds is that of the second mortgage bondholders themselves. Their trustees, who are entitled to represent them, regard it of vital importance that that interest shall be paid. In that opinion the court fully concurs, and would regard them as grossly derelict in the discharge of their duty, on the facts as they appear in this case, if they so far failed to appreciate the

situation as to stand idly by and permit the interest upon the first mortgage bonds to go unpaid. When Huntington, as the owner of a majority of the second mortgage bonds, and of a large amount of defaulted interest thereon, filed a bill for the benefit of himself and all others in a like situation, he at once assumed a fiduciary relation with respect to other holders of bonds of that class, and would not be permitted to use a security intended for the common benefit of himself and associates as to do injury to them that he might profit by reason of a greater interest in another class of securities. What I have said as to Huntington applies equally to the United States Trust Company, the present holder in trust of Huntington's bonds and other securities upon which his suit was filed. It stands in his shoes, as do the Illinois Central Railroad Company and the Louisville & Nashville Railroad Company, each of whom has a contingent interest in the bonds and other securities originally owned by complainant Huntington, and now held, under the reorganization trust, by the United States Trust Company. The unity of the interests of all the second mortgage bondholders involves a unity of obligation by each, with respect to their common security. Jackson v. Ludeling, 21 Wall. 622.

It is not now proper to pass upon the question as to the conduct of the trust company, under the trust to it, in submitting its conduct with respect to the bonds and other securities held by it, and its attitude in this litigation, to the domination of one of the interests represented by it. Whether it should not, with respect to the emergency now threatening the second mortgage bondholders, exercise its own judgment with an eye single to the interests of the second mortgage bondholders as a class, and not suffer its action to be dictated by one of the beneficiaries under the trust, especially when that beneficiary is much more largely interested in an antagonistic class of securities, is a question which I will not now pass upon. The duty of the trust company is quite complicated, and presented embarrassments not ordinary. It is sufficient for me to say that when that trust company undertakes to speak as a holder of a majority of these subordinate bonds, it does so, by its own confession, under coercion. "The voice is Jacob's voice, but the hands are the hands of Esau." It does not pretend that it is to the interest of the second mortgage bondholders as a class that the maturity of the first mortgage shall be precipitated, and that the interest of the second mortgagees in this property shall be thereafter held subject to the power of the prior and larger interest to foreclose at its will unless redeemed by the second mortgagee. I cannot accept its objection as of any moment when considering the rights and interests of the second mortgagees. There is a class of second mortgage bondholders—a minority it is true, yet aggregating more than a million in value—whose interests in the second mortgage are identical with its own. Acquiring its bonds after suit had been instituted on them for the benefit of all other holders of such bonds, its voice should not be potential when it confesses that its action is dominated by a majority of the reorganization committee of the mortgagee desiring to precipi-

tate maturity of an adverse security. That large minority have, through G. W. Norton, been permitted to intervene and become co-complainants with the trustees in their foreclosure bill.

But it is said that the court has no power to authorize the borrowing of money by the receivers to meet interest. It seems to me that if the court has the right to use earnings to pay off the indisputable debt of the Chesapeake, Ohio & Southwestern Railroad Company, it has equally the right to anticipate earnings in a crisis like that now presented. The receivers in open court have stated that the surplus earnings of the next four months will be sufficient, after paying operating expenses, to meet the interest which must be paid by the 1st day of February if the maturity of the first mortgage bonds is to be prevented. In view of the fact that the question has been made by general creditors that the surplus earnings, under Huntington's bill, are properly applicable only to the payment of Huntington's judgment and other debts of like class which have since intervened, I ought not, on this application, to appropriate such earnings, as against the objection of that class of creditors, to the payment of this interest. While, as I have already said, a very strong impression that the bill of Mr. Huntington as amended is to be treated as a bill impounding the earnings for the benefit of second mortgage bondholders as well as general unsecured creditors, I do not deem it necessary or proper for me to now decide this question. Since the filing of the foreclosure bill by the trustees of the second mortgage there can be no further contention that future earnings are to be regarded as exclusively impounded for the benefit of general creditors. These trustees themselves consent that these future earnings, instead of being applied to the payment of the principal or interest of the bonds represented by them, shall be applied to the preservation of the general interests of the second mortgage bondholders by preventing a maturity of the first mortgage. These trustees also agree that the peril to the interests represented by them is so great that they are willing that money borrowed to avert this threatened evil shall be paid out of the corpus of the property before the claims of the second mortgage. I do not think that the duty of preserving the property in charge of the receivers is limited to a mere preservation of the physical structure of the railroad. If the earnings were insufficient to pay off taxes which were a prior lien upon the property, or to pay off mechanics' liens, the enforcement of which would result in a serious disintegration of the road, or to pay off any other claim which was entitled to preference, and which was so situated that for its satisfaction the property might be brought to a premature sale, the court could not only use the earnings in the hands of the receivers, but could charge the property, and every interest in the property, with receivers' certificates, issued for the purpose of avoiding consequences quite as serious in their ultimate effect to subordinate interests as would be the destruction of a bridge. I am convinced that, where large financial interests are secured by a lien of a subordinate character, and a foreclosure of this subordinate lien is sought, subject to prior incumbrances, it is within the scope and dis-

cretion of a court of equity, in preserving this subordinate interest, to pay off any just liability of an insolvent railroad company out of the earnings, and, if the earnings are insufficient, that it may authorize the borrowing of money secured by a charge and burden upon the subordinate interests to be thus benefited by the loan. These views I hold very firmly. If they be sound, my duty, under these circumstances, and upon this record, is to see to it that these great subordinate interests are not destroyed as the consequence of an unnecessary precipitancy of the maturity of the first mortgage bonds. Under such circumstances I am convinced that the power of this court to pledge the future surplus earnings of the property and the property interests of the creditors subordinate to the first mortgage is as clear as would be the duty to borrow money to rebuild a bridge, or to prevent the sacrifice of a valuable lease. Miltenberger v. Railroad Co., 106 U. S. 286, 1 Sup. Ct. 140; Kneeland v. Luce, 141 U. S. 508, 12 Sup. Ct. 32; Park v. Railroad Co., 64 Fed. 190. I shall therefore direct the receivers to pay the interest which fell due August 1, 1894, out of the future earnings of the property in their hands, and that they be authorized to borrow a sufficient sum upon receiver's certificates, maturing in not less than three nor more than six months, for the payment of which the future income of the road after paying rentals, necessary repairs, and other operating expenses, will be pledged, and that these certificates shall be a lien upon the corpus of the property, subordinate, however, to the lien of the first mortgage bondholders, and to every other claim which shall be ultimately held entitled to priority of satisfaction out of the corpus over the first mortgage bonds. The consent of the trustees under the second mortgage that these certificates shall be a charge superior to their own lien operates, in the absence of fraud or corruption, to bind every bondholder of that class. Kneeland v. Luce, above cited.