NEW YORK SECURITY & TRUST CO. v. LOUISVILLE, E. & ST. L. CONSOL. R. CO. et al.

(Circuit Court, D. Indiana. May 19, 1900.)

No. 9,125.

1. RAILROADS—RECEIVERSHIP OF CONSOLIDATED ROAD—RIGHT TO APPORTIONMENT OF PREFERENTIAL DEBTS.

Where a court, on application of a mortgagee, has taken possession of and operated by its receivers a railroad formed by the consolidation of different lines, and such receivers, under orders of the court, procured or assented to by the complainant, have paid operating expenses, taxes, debts for equipment, and interest on prior divisional mortgages, on certain of the constituent lines, and in so doing have incurred a preferential indebtedness, the complainant is not entitled, on the subsequent foreclosure and adjustment in the same suit of all the various mortgages on the property, to have such preferential debt apportioned between the several mortgage interests, or to require an accounting between the several constituent lines of the receipts and disbursements on account of each during the receivership, and prior to its extension to the divisional mortgages, which would result in the displacement of the liens of some of such mortgages in favor of its own; but having the junior lien, and having procured the receivership in its own interest, the debt thereby created is primarily a charge upon its interest in the property.

2. SAME—MORTGAGES—AFTER-ACQUIRED PROPERTY CLAUSE.

An after-acquired property clause in a railroad mortgage extends only to property subsequently acquired by the mortgagor, and, where the mortgagor company becomes merged by consolidation in a new company, such clause cannot be construed to cover equipment acquired by the consolidated company as against a mortgagee of such company.

3. SAME—EXCHANGE OF BONDS—NOVATION.

Articles of consolidation between railroad companies provided for an issue of bonds by the consolidated company to be exchanged for outstanding bonds of the constituent companies. They authorized the directors of the new company, in case any of the old bonds remained unexchanged, to "make such arrangement in regard thereto, not inconsistent with these articles, as in their opinion the interest of said consolidated company may require," and also, in another article, to "adopt such plan, not inconsistent with these articles, as shall protect the rights of the holders of new bonds issued in such exchange, as against the holder of any bond of any of such constituent companies who shall not exchange the same as herein provided." No action was ever taken by the directors under either of said provisions. Holders of a portion of the second mortgage bonds of one of the constituent companies delivered their bonds to an agent of the new company in exchange for new bonds, nothing being said as to the disposition to be made of the surrendered bonds. *Held*, that the exchange worked a novation of the debt, and operated as an extinguishment of the bonds surrendered.

4. SAME—EQUITABLE RIGHT TO ENFORCE SURRENDERED BONDS.

No action having been taken by the consolidated company indicating an intention to keep the surrendered bonds alive, but it having subsequently issued a second series of bonds secured by a new mortgage, the recitals of prior indebtedness in which showed such bonds to have been paid, the equities of purchasers of bonds of such new issue, and of subsequent purchasers of unexchanged bonds secured by the same mortgage, in reliance upon the extinguishment of a large part of the debt thereby secured, were superior to any equity in favor of the holders of the first consolidated bonds, whether acquired by exchange or purchase, to have the surrendered bonds kept alive and enforced as collateral security to their holdings.

On Exceptions to Master's Report.

Hornblower, Byrne, Taylor & Potter and Charles W. Fairbanks, for complainant.

Humphrey & Davie, Miller, Elam & Fesler, Wm. Marshall Bullitt, Alexander Gilchrist, St. John Boyle, Iglehart & Taylor, and Bluford Wilson, for defendants.

WOODS, Circuit Judge. The Louisville, Evansville & St. Louis Consolidated Railroad Company had its origin on May 21, 1889, in an agreement for the consolidation of railroad companies in Indiana and Illinois. For convenience, its road may be said to have been made up of two divisions,—the eastern, extending from New Albany, Ind., opposite Louisville, Ky., to Mt. Vernon, Ill.; and the western, extending from Mt. Vernon to East St. Louis. The eastern division, itself in part the result of a prior consolidation, includes two branch roads, the Evansville, Rockport & Eastern, called here the Evansville, and the Huntingburgh, Tell City & Cannelton, called the Huntingburgh. Until the consolidation of May, 1889, the Huntingburgh road remained an independent organization. It was subject to a mortgage for $300,000. The Evansville road, subject before to a separate mortgage for $900,000, had been consolidated with the road constituting the main line of the eastern division, under the name of Louisville, Evansville & St. Louis Railroad Company, which on December 26, 1886, executed two mortgages, called the first and second; the first for $2,000,000, and the second for $3,000,000. Included in

the western division were the Illinois & St. Louis Railroad & Coal Company, which on June 1, 1875, had executed a mortgage for $200,-000, and the Venice & Carondelet Railroad Company, which, prior to the consolidation, had executed two mortgages, each for $150,000. The bonds secured by the mortgages mentioned were each for $1,000, and were all outstanding and unpaid at the time of the consolidation. The second of the articles of consolidation is to the effect that existing mortgages on the properties of the constituent companies "shall be taken up." The fourth article required the issue by the consolidated company of "8,000 consolidated first mortgage, five per cent., fifty year, gold coupon bonds, of $1,000 each," secured by a mortgage on the entire property of the consolidated company, derived from the constituent companies, to be placed in a safe place, by direction of the board of directors of the consolidated company, and "thereafter held in trust for the purpose of exchange, according to the terms of these articles of consolidation," except 925 thereof, intended for another designated use; "and," as the article concludes, "in case any holder or holders of any of the bonds or stock of said constituent companies shall neglect or refuse to exchange any of such bonds or stock for the said consolidated bonds, as herein provided, the directors of said consolidated company shall be empowered to make such arrangements in regard thereto, not inconsistent with these articles, as in their opinion the interest of said consolidated company may require." The eighth article provided that the "bonds, being prepared and ready for issue," were to be deposited as follows:

"(a) To be used in taking up and in satisfaction of the first mortgage bonds of said Louisville, Evansville & St. Louis Railroad Company, and in redemption thereof, two thousand (2,000) of said bonds; (b) to be used in taking up and in satisfaction of three thousand (3,000) second mortgage bonds of said Louisville, Evansville & St. Louis Railroad Company, and in the redemption thereof, twenty-two hundred and fifty (2,250) of said bonds, exchanging old bonds at seventy-five (75) cents for new bonds at par; (c) to be used in taking up and in satisfaction of the first mortgage bonds on the Evansville division of the said Louisville, Evansville & St. Louis Railroad Company, and in the redemption thereof, nine hundred (900) of said bonds; (d) to be used in taking up and in satisfaction of the first mortgage bonds of said Huntingburgh, Tell City & Cannelton Railroad Company, and in the redemption thereof, three hundred (300) of said bonds."

In like manner it was provided that 500 of the bonds should be used "in taking up and in satisfaction" of the mortgage bonds of the constituent parts of the western division, and that 925 bonds should be sold and the proceeds used for the purpose of constructing and equipping the railroad of the Belleville, Centralia & Eastern Railroad Company, necessary to the construction of the line of the western division between Mt. Vernon and Belleville, a distance of about sixty-four miles.

The ninth article reads in this wise:

"Such of the bonds of any of said constituent companies as may be surrendered and exchanged as herein provided shall be stamped and defaced so that they shall not be negotiable; and the board of directors of said consolidated company may adopt such plan, not inconsistent with these articles, as shall protect the rights of the holders of new bonds issued in such exchange, as against a holder of any bond of any of said constituent companies who

shall not exchange the same as herein provided, and upon the surrender of all of said bonds of all of said constituent companies they shall be destroyed."

The consolidated mortgage bears date July 1, 1889, and, after reference in its preamble to the agreement of consolidation, asserts authority for the consolidated company to issue bonds "for the purpose of exchanging the same for bonds now secured by mortgage upon any of the property of the constituent companies contemplated by said agreement and in said articles of consolidation."

The bonds secured by the consolidated mortgage were delivered into the possession and custody of the New York Security & Trust Company, one of the two trustees in that mortgage, for disposition according to the agreement of consolidation; and before January 11, 1890, the bonds secured by the second mortgage upon the eastern division to the number of 2,330 had been surrendered by the holders to that company in exchange for consolidated bonds, and on surrender had been stamped on the back thereof "Canceled." An assistant secretary of the company has testified that when the surrendered bonds were so stamped the secretary of the company gave instruction that the bonds were to be held by the security and trust company as against the second mortgage; that they were to hold the bonds until they all came in, and then destroy or so cut and deface them as to make them nonnegotiable, and destroy the mortgages; that they examined the articles of consolidation at the time the bonds were received. There is other testimony to the same effect. The remaining 670 of the bonds secured by the second mortgage on the eastern division have never been presented for exchange, and are represented in this litigation by the Louisville Trust Company, trustee, successor to the original trustees named in the trust deed by which they are secured. Bonds secured by the consolidated mortgage were issued and are outstanding to the amount of $3,797,500, including, to the amount of $1,747,500, those exchanged for the 2,330 surrendered seconds.

On March 1, 1893, the consolidated company executed to the New York Security & Trust Company and Erastus P. Huston, trustees, a second mortgage, called in this record the "general mortgage," to secure bonds for $15,000,000, designed primarily for the purpose of taking up, dollar for dollar, all bonds secured by prior mortgages on the consolidated road and its constituent parts. Bonds secured by that mortgage to the amount of $2,000,000 or more were issued and are outstanding, but no exchange thereof for bonds of a prior issue was effected. In that mortgage the number of seconds outstanding is stated to be 670, the redemption of that number only is authorized, and it is further provided that the bonds surrendered for exchange "shall be so canceled and defaced as to destroy their negotiability, and shall be held and kept alive by the New York Security & Trust Company, to the end that the holder of said bonds hereby secured may be subrogated in the outstanding mortgages, respectively, to the rights of the holder of said bonds now outstanding, and so exchanged and surrendered for said new general mortgage gold bonds hereunder issued." Each of the mortgages mentioned contains the customary after-acquired property clause.

On January 4, 1894, on the petition of Thomas Barrett and James H. Wilson, E. O. Hopkins and Wilson were appointed receivers of the consolidated property by this court. That was done in confirmation and extension of the previous action of the United States circuit court for the Southern district of Illinois. The bill on which the appointment was made purported to be brought by the complainants "on their own behalf and on behalf of all creditors and stockholders" of the consolidated company; Barrett, it was alleged, being the owner of 5,069 of the 40,000 authorized shares of common stock and of $300,000 of general mortgage bonds, and Wilson the owner of 450 shares of the common stock. The insolvency of the company, its inability to meet its obligations, including a floating indebtedness of $900,000, and other reasons for the appointment of receivers, were alleged, and the appointment was sought "for the purpose of preserving the unity of the system, and preventing the disruption thereof by separate executions, attachments, or sequestrations, the occurrence of which," it was alleged, "will be inevitable, in view of the unavoidable defaults in payments of interest and other obligations which will presently occur." The consolidated company, the sole defendant named in the bill, appeared and answered, consenting to the appointment of receivers.

The road was operated under this receivership until November 26, 1894, when another appointment of the same receivers was ordered under a bill brought on the preceding September 6th by the New York Security & Trust Company, trustee, for the foreclosure of the consolidated mortgage, alleged to have been matured by reason of defaults in the payment of interest. That bill, to which only the consolidated company and Erastus P. Huston, co-trustee with the complainant in the general mortgage, were made defendants, without referring to the existing receivership, prayed that receivers be appointed with the usual powers. The order of appointment was granted, but upon the express condition that the receivers should pay all wages of employés, all indebtedness already created or liability incurred in the operation of the road by the receivers under their appointment in the Barrett suit, and particularly any sums of money borrowed under order of court for payment of interest upon bonds or other indebtedness of the company, should carry out and perform all contracts made under order of court in that suit for the betterment of the property of the company, and should pay for materials and supplies used in the operation of the property and furnished within six months prior to January 2, 1894; "to which condition imposed by the court the trust company," says the order, "objects, excepting that portion thereof which directs the payment of wages of employés." On the next day this suit and the suit of Barrett and Wilson were consolidated.

On December 28, 1894, Huston, as trustee therein, filed in the consolidated cause a cross bill for the foreclosure of the general mortgage; praying, among other things, that that mortgage be declared a first lien upon certain after-acquired property, and that receivers be appointed, but no order to that effect was entered. The receivers so appointed under the bill of the New York Security & Trust Com-

pany continued in charge until March 9, 1896, when bills were brought by the respective trustees to foreclose the first and second mortgages on the eastern division and the mortgage on the Huntingburgh road. Each bill prayed for a separate receiver, and accordingly the appointment of George T. Jarvis was ordered, to take effect on the 1st of the ensuing May, and, Wilson and Hopkins having resigned on April 29, 1896, Jarvis was made receiver under each of the bills which had been brought; the order of appointment providing for a reference to W. P. Fishback, master, to ascertain and report upon the following subjects: (1) What debts due by the Louisville, Evansville & St. Louis Consolidated Railroad Company have been paid by the receivers, James H. Wilson and E. O. Hopkins? (2) On what division or part of the road those debts were specially chargeable, if they were chargeable upon any particular division? (3) What was the indebtedness of the said receivers, Hopkins and Wilson, on the 1st day of May, 1896, and in what does it consist? (4) How should that indebtedness be chargeable,—that is, upon what divisions or portions of the road should the same be considered a lien or charge,—and of any debt which is in form a charge against the whole line, or was incurred for the benefit of the whole line, what portion should be chargeable against the several divisions? A somewhat similar order had been made upon the petition of the New York Security & Trust Company, filed in the consolidated cause on December 23, 1895, praying that the receivers be required to keep and file accounts showing the earnings of each portion of the road under separate mortgage, and of the expenditures thereon for current expenses and for betterments or otherwise.

On July 20, 1897, the trustee of the mortgage on the Evansville road filed a bill for the foreclosure of that security, and obtained an order extending the receivership to that suit. On April 27, 1898, the causes were all consolidated, and, being at issue, were referred to the master by an order containing, besides other provisions, requirements, substantially like those recited above, for an accounting between divisions. The master accordingly, on February 22, 1900, filed a report, bringing the account to December 31, 1898, and exceptions thereto were filed by the trustees, respectively, of the mortgages upon the eastern division and the Evansville and Huntingburgh branches; but at the beginning of the argument, on April 20, 1900, it was announced that the bonds secured by the first mortgage on the eastern division had been acquired by the owners of the consolidated mortgage bonds, and the counsel representing the exceptions taken in the interest of the first mortgage bondholders urged a decree on the basis of the master's report. The net result of the account reported by the master is a charge against the main line of the eastern division of $548,940.25, against the Huntingburgh road of $58,280.50, a credit to the Evansville road of $31,643.74, and to the western division as an entirety a credit of $59,740.64. The chief items of the account are payments of taxes, which in part were delinquent when the receivers were first appointed, interest on mortgage bonds, and charges for betterments, equipment, rentals, terminal expenses, and interest on the values of terminals. The in-

debtedness of the receiver, not including certain receiver's certifi-
cates otherwise specially provided for, which were issued for the
purchase of equipment, the belt line at New Albany, and the Louis-
ville & St. Louis Railway, was not far from $300,000, including
receiver's certificates to the amount of $280,000, issued in 1897 to
take up certificates issued in 1895. On equipment purchased by the
consolidated company there was due on January 4, 1894, $302,958.60,
on which Hopkins and Wilson paid $147.821.25, and Jarvis paid
$139,212.35. The payments were made out of the income of the
property or out of proceeds of the receiver's certificates mentioned.
The receivers have also paid as it became due semiannually the in-
terest on the mortgages executed by the Illinois & St. Louis Railroad
& Coal Company and the Venice & Carondelet Railroad Company,
amounting in the aggregate to as much as $200,000, and also have
paid considerable sums upon equipment purchased under the orders
of the court and on the purchase price of the New Albany Belt &
Terminal Railroad and of the Louisville & St. Louis Railway.

There is here no question directly between general creditors and
mortgagees of railroad property. The dispute is between the trus-
tees of different mortgages, or, more definitely stated, between the
trustees in mortgages executed by the original companies before the
consolidation on the one side, and the trustee in the consolidated
mortgage on the other side. There is a receiver's indebtedness of
something more than $300,000, in respect to which the question is
whether it shall be charged primarily upon the interest in the prop-
erty covered by the consolidated mortgage or be apportioned be-
tween the different mortgage interests, and, if so, on what basis.
The further question, involving a number of subordinate inquiries,
is whether on the master's accounting the eastern division and the
Huntingburgh road shall be compelled to pay to the receiver the
several sums charged against them. There is no available method
of effecting such payment without a sale of the respective properties,
and, when the sale shall have been made, the proposition of counsel
representing the consolidated mortgage and the first mortgage on
the eastern division is that the proceeds shall be used, first, to pay
to the western division and to the Evansville road the respective
amounts credited to them by the master, and the remainder applied
in discharge of receiver's indebtedness. If the entire indebtedness
should be so paid, to that extent the question of apportionment be-.
tween divisions would, of course, be eliminated. The result, it is
evident, would be to the advantage of the consolidated mortgage;
and so, too, any sum paid in discharge of the credit to the western
division, it is obvious, would go to those interested in that security.
When it is remembered that in the account reported are included,
besides the customary expenses of operation, rentals for cars and
other equipment belonging to the consolidated company and covered
by the lien of the consolidated mortgage, and interest on the value
of terminal property at East St. Louis, it will be perceived that the
court is now asked to displace mortgage securities in favor of claims
of a character never before deemed entitled to such preference. In
the Kneeland Case, 136 U. S. 92, 10 Sup. Ct. 950, 34 L. Ed. 379, and

in the Thomas Case, 149 U. S. 95, 13 Sup. Ct. 824, 37 L. Ed. 663, claims for car rentals were denied priority, in the latter case on the ground "that the car company contracted upon the responsibility of the railroad company, and not in reliance upon the interposition of a court of equity" (Virginia & A. Coal Co. v. Central R. & B. Co., 170 U. S. 355, 370, 18 Sup. Ct. 657, 43 L. Ed. 1068); but now it is proposed that a railroad company, created by the consolidation of lines of road already under mortgage, may, by a course of operation entirely under its own control, fasten upon the corpus of the constituent lines a charge, prior in equity to mortgage liens of antecedent date, for its expenses of operation, for the use of its equipment, and for interest on the value of its terminals. If that be possible, then, indeed, is it true, as was said in Central Trust Co. v. Wabash, St. L. & P. Ry. Co. (C. C.) 46 Fed. 26, 35, that "a mortgage upon a railroad, instead of having stable value, according to the fixed principles of law and equity applicable to mortgages upon real estate, is subject to displacement at the will of the mortgagor, as well for his own interest as for the benefit of other parties to contracts of subsequent date, which upon principles hitherto supposed to be established should be subject to existing and recorded mortgage liens." For the time since the extension of the receivership under the bills brought for the foreclosure of the underlying mortgages such an accounting between the divisions of the road under distinct mortgages may be justifiable, but for the period covered by the operations of the first receivers it is, as I conceive, only in respect to the sums expended in the payment of delinquent taxes and interest on the prior mortgage bonds, and in permanent betterments of the divisional lines, that the argument in favor of an accounting, which involves a displacement of mortgage securities, can be said to be even plausible; but, while in those respects plausible to a degree at first blush, it is, I think, inconsistent with sound principles, and in its tendency necessarily unjust.

Counsel for the security and trust company have relied chiefly upon the rulings in Ames v. Railroad Co. (C. C.) 74 Fed. 344, and Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963. These cases will be referred to again. In a general sense, it is, of course, true, as stated in the Ames Case, in reiteration of what had been said in the case under the same title (60 Fed. 966), that receivers of an insolvent railroad corporation, appointed to preserve its property and operate its roads, do not stand in the shoes of the corporation; are neither the representatives of the corporation, nor of its creditors or stockholders, but are officers and representatives of the court,—the hands of the court, in which it holds the property while it operates the roads for the benefit of those ultimately entitled to the property and the income. To the same effect, in Union Nat. Bank of Chicago v. Kansas City Bank, 136 U. S. 223, 236, 10 Sup. Ct. 1013, 34 L. Ed. 341, the supreme court said that "a receiver derives his authority from the act of the court appointing him, and not from the act of the parties at whose suggestion or by whose consent he is appointed, and the utmost effect of his appointment is to put the property from that time into his custody as an officer of

the court, for the benefit of the party ultimately proved to be entitled to it, but not to change the title, or even the right of possession, in the property." While, in the broad sense intended, this is unquestionable, yet it is equally certain that the doctrine of Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, often reaffirmed in the later cases, has put railroad receiverships, in respect to preferred claims, upon a distinctly modified basis. In the Kneeland Case (136 U. S. 92, 10 Sup. Ct. 950, 34 L. Ed. 379), the doctrine was more fully elaborated, and more distinctly defined, perhaps, than in any case before or since. The principles there enunciated were carefully considered and applied by this court in the Wabash Case, referred to supra (46 Fed. 26), and they seem to me to be determinative of the present questions. With slight variation from the language, but not from the sense, of the opinion of Justice Brewer, the propositions now especially relevant may be restated as follows: (1) It is the exception, and not the rule, that priority of liens can be displaced. (2) A court which appoints a receiver acquires, by virtue of that appointment, certain rights and assumes certain obligations. (3) The expenses which the court creates in the discharge of those obligations are burdens necessarily on the property taken possession of; and this, irrespective of the question who may be the ultimate owner, or who may have the preferred lien, or who may have invoked the receivership. (4) So if, at the instance of any party entitled thereto, a court should appoint a receiver of property, the same being railroad property, and therefore under obligations to the public of continued operation, in the administration of such receivership it may rightfully contract debts necessary for the operation of the road, either for labor, supplies, or rentals, and make such expenses a prior lien upon the property itself. (5) When the holder of a lien upon the realty alone of a railroad asks the court in chancery to take possession, not only of the real, but also personal property, and for the benefit of the real, that application is a consent on its part that the rental value of the personalty thus taken possession of and operated for the benefit of the railroad shall be paid in preference to its own claim. (6) If the holder of a lien upon a railroad does not think the continued possession of the personalty a benefit to him, he should omit it from his bill, and ask the court to take possession of the railroad alone. (7) The court is not to be assumed to be an experienced railroad manager. It is a mistake to suppose that the duties of trustees in a mortgage in respect to the foreclosure proceedings are formal merely, or limited to the employment of counsel and the handling of securities. "They assume all the obligations of a party to the suit. They are charged with the care of the entire mortgage interest. * * * It is a part of their duty to make examination and to become fully informed in respect to the property, its liens, what is needed for its operation, and what can prudently and safely be dispensed with. Upon such information their application should be based." Though not concluded by their representations, the court's information is in the first instance derived therefrom, and it may and does generally act upon them. (8) Any action of the court, based on the representations of trustees in a mortgage

in process of foreclosure, "must be held to be conclusive, so far as concerns the interest they represent, in respect to all liabilities and obligations flowing from the possession of the receiver."

Under the first appointment the receivers in this case, as in the Wabash Case, and in the case of New England R. Co. v. Carnegie Steel Co., 21 C. C. A. 219, 75 Fed. 54, "stood practically for the corporation itself"; but when on November 26, 1894, the security and trust company asked for the appointment of receivers upon its bill, and "submitted to the order" of that date, it assumed retroactively, I am inclined to think, the position of original complainant; certainly, by subsequent conduct, and by force of the principles enumerated in the fifth, seventh, and eighth propositions, supra, it became responsible for what was done in the receivership from the beginning; and the orders of court, under which the large sums reported by the master were paid out by the receivers, for taxes and operating expenses, for repairs of equipment, for betterments, and for interest upon the several mortgages on the eastern division and on the Evansville and Huntingburgh lines, may properly be held to be conclusive so far as concerns the consolidated mortgage interest. The payments on interest, taxes, and betterments were made largely after November 26, 1894, and the orders for the issue of receivers' certificates made necessary by such expenditures were all made in 1895, under the second appointment. By assenting to the issue of the certificates, the security and trust company, even if not otherwise bound, should be deemed to have ratified what had been done. There is no consideration of justice or equity which calls for a review of the orders of the court under which the liabilities were incurred. The motive for the payment of interest on the underlying divisional mortgages, it is clear, was to make it impossible that the trustees therein or the bondholders should seek to obtain possession of their respective properties, and so acquire the advantages of control and "be charged with the responsibility of operation." To permit a recharge upon the several portions of the road of the interest so paid, to repeat the expression of the supreme court in the case of Morgan's L. & T. R. & S. Co. v. Texas Cent. Ry. Co., 137 U. S. 179, 196, 11 Sup. Ct. 61, 34 L. Ed. 625, "would be to permit the speculative action of third parties to defeat contract obligations, and to concede power over the property of others which even governmental sovereignty cannot exercise without limitation." This is applicable to the whole theory of making an apportionment between subdivisions of the consolidated road of the preferential debts antedating the appointment of receivers, and of an accounting for income and expenditures after the appointment, for the purpose of creating a charge upon any division in favor of another to the displacement of mortgages of prior date.

The purpose of the supreme court not to depart in any wise "from the force of the intimations contained in the recent utterances" in the Kneeland and Thomas Cases was declared in Virginia & A. Coal Co. v. Central R. & B. Co., 170 U. S. 355, 370, 18 Sup. Ct. 657, 42 L. Ed. 1068; and in respect to the Kneeland Case it was there remarked that "particular attention was called, among other things, to the

fact that the receivership at the suit of the judgment creditor was not for the benefit of the mortgage bondholders, so that it could not be asserted that the expenditures of such receivership were payable in any event out of the income or corpus of the property." Of like significance in respect to responsibility for what is done by receivers is the expression in Morgan's L. & T. R. & S. Co. v. Texas Cent. Ry. Co., supra, that "by the payment of interest, the interposition of the bondholders was averted, they could not take possession of the property, and should not be charged with the responsibility of its operation."

With the benefit of his experience in the Wabash Case, illustrated by his opinions in 23 Fed. 863, 30 Fed. 332, 34 Fed. 259, and 38 Fed. 63, no one could have been better prepared than Justice Brewer to declare the scope and limitations of the new doctrine of preferred claims, and to define the resulting duties and responsibilities of parties who should invoke or instigate the appointment of receivers of railroad properties. In the last of the Wabash Cases decided at circuit (38 Fed. 63), reversing a ruling made in the case reported in 34 Fed. 259, he held that until the preferential debts had been paid the income over expenses derived from a branch line should not be used to pay interest due upon mortgage bonds secured by a mortgage on that line. This ruling was the result of the construction placed upon previous orders of the court, but it necessarily involved the principles now under consideration. The opinion concludes with the remark, "I am also inclined to think that possibly one or two other reasons given by the respondents are sufficient to compel the ruling we now make, but I do not care to enter into any discussion of them." The compelling reasons which this court found for a like ruling against the trustees in the mortgage upon the Peru Branch of the Wabash System were deduced from the opinion in the Kneeland Case, then but recently published, and parts of the opinion of this court then delivered are sufficiently pertinent to the present discussion to justify quotation:

"If the application for the appointment of receivers had been by a mortgagee of the Wabash Company, instead of the company itself, the applicant might have so framed his bill as to escape responsibility, on the theory of consent, for any action of the court or its receivers in respect to the leased roads. In this respect the opinion in Kneeland v. Trust Co. is quite as explicit as in the recognition of the doctrine, in which the cases following Fosdick v. Schall agree, that the mortgagee or lienholder who procures a receivership thereby consents to the subjection of his interest in the property, of which possession is taken at his instance, to the discharge of all liabilities and expenses incurred by the receiver under the proper orders of the court. When, therefore, as in this case, receivers are appointed upon the petition of an insolvent debtor, and there is behind the court no responsible party who has an interest in the property which may be applied to the payment of court debts and expenses, the situation is essentially different, and the administration of the trust and the adjustment of liabilities for past and current expenses, it would seem, must be upon principles somewhat different from what should otherwise govern. It is certainly not true in this case, as counsel for the intervener have strenuously insisted, 'that the court took possession of the leased road for the benefit of the Wabash Company and its mortgagees and creditors, and not for the benefit of the lessor companies and their mortgagees.' On the contrary, under the contracts of lease, the

lessor companies and their mortgagees were themselves creditors of the Wabash Company, and the action of the court in appointing receivers, upon the motion of that company, was necessarily, in law and equity, as much for their benefit as for the benefit of any other mortgagee or creditor. And it follows that the rights of all the parties must be determined and enforced with due reference to the respective contracts and mortgages under which they claim, or out of which their rights have arisen.  *  *  *  [After reference to the Miltenberger Case, 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117:] When, however, as in this case, the lease is for a long term, the practical result is an incorporation of the leased line into the body and ownership of the principal line, and in no just sense is the value of the use of one more than of the other an operating expense of the combination.  *  *  *  If, upon the filing of their cross bill, the court had granted the motion of the trustees of the general mortgage for the appointment of receivers in their interest, or had sustained any of the like motions which they afterwards made, they would have become responsible, I suppose, for the conduct of the receivership from that time, as if the appointment had been made upon their own motion in the first instance, and so, perhaps, the interest represented by them might have been subordinated to the intervener's claim thereafter accruing; but, the court having denied all their efforts to obtain charge of the receivership, it cannot be said that any order of the court rests upon their implied consent.  *  *  *  The Wabash Company, by making the contract of June 1, 1881 (by which the Peru road was acquired), certainly neither conferred nor acquired any rights which, in respect to the mortgaged properties, were not subject to the mortgages theretofore made; and the court, by appointing receivers at the instance of that company, did not, as I conceive, acquire power to change the order of priority in that respect."

There are many later cases in the circuit courts and in the circuit courts of appeals which have been cited as bearing upon the subject. Special reference has been made already to some of them. They are: Ruhlender v. Railroad Co., 62 U. S. App. 1, 33 C. C. A. 299, 91 Fed. 5; New England R. Co. v. Carnegie Steel Co., supra; Railroad Co. v. Harrison, 32 C. C. A. 130, 88 Fed. 913, 924; Bound v. Railway Co. (C. C.) 47 Fed. 30; Farmers' Loan & Trust Co. v. Kansas City, W. & N. W. R. Co. (C. C.) 53 Fed. 182, 192; Phinizy v. Railroad Co. (C. C.) 62 Fed. 771; Lloyd v. Railroad Co. (C. C.) 65 Fed. 351; Hook v. Bosworth, 12 C. C. A. 208, 64 Fed. 443; Farmers' Loan & Trust Co. v. Iowa Water Co. (C. C.) 78 Fed. 881. Reference has also been made to Morgan's L. & T. R. & S. Co. v. Texas Cent. Ry. Co., supra; Wood v. Deposit Co., 128 U. S. 416, 424, 9 Sup. Ct. 131, 32 L. Ed. 472; Railroad Co. v. Humphreys, 145 U. S. 105, 114, 12 Sup. Ct. 787, 36 L. Ed. 632.

The principles stated, if sound and applicable, either eliminate or afford a clear solution of the questions raised by the exceptions to the master's report in this case.

The effect of the consolidation, it is admitted and seems to be well established on authority, was practically, if not legally, to extinguish the original railroad companies, and to bind the consolidated company for the payment of all liabilities of the constituent companies, including the mortgage debts, as if they had been originally of its own creation. Railway Co. v. Boney, 117 Ind. 501, 20 N. E. 432, 3 L. R. A. 435; Railway Co. v. Prewitt, 134 Ind. 557, 33 N. E. 367; Railway Co. v. Hall, 135 Ind. 91, 34 N. E. 704, 23 L. R. A. 231; American Loan & Trust Co. v. Minnesota & N. W. R. Co., 157 Ill. 644, 42 N. E. 153; Railway Co. v. Ashling, 160 Ill. 373, 43 N. E. 373. See, also,

Clearwater v. Meredith, 1 Wall. 25, 17 L. Ed. 604; Shields v. Ohio, 95 U. S. 319, 24 L. Ed. 357; Pullman Palace-Car Co. v. Missouri Pac. Ry. Co., 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499. The constituent roads were merged into one, and, as if so constructed in the beginning, became a unit, under one management and one ownership. After the consolidation, whatever was expended by the consolidated company, whether in the payment of local taxes, or in the making of local improvements or betterments, was for its own interest in an entire single property; and, if it paid interest upon bonds secured by divisional mortgages, it simply discharged its own obligations, and correspondingly enhanced the value of the security given to the holders of its bonds. It could neither incur, nor put it in the power of another to create, any liability which should have preference over an existing mortgage lien, except to the extent allowable by a court of equity when it should become necessary to put the road in the hands of a receiver, and of that possibility any subsequent grantee or mortgagee was bound to take notice. Current debts, for whatever consideration, do not become a lien in the first instance, of course; but, if for labor or supplies necessary to the continuous operation of the road, they may become a lien prior, if necessary, to any and all mortgages or other rights resting in contract, and so must every one understand who deals with a railroad company. Under no circumstances can there be an innocent purchaser entitled to protection against the power of the court to compel the payment of preferred claims. By virtue of that power of the courts such claims, though of undetermined identity and amount, are secured in effect as if by a recorded mortgage, of which the world must take notice. This, obviously, is true of all mortgages, prior and junior alike. The purchasers of bonds secured thereby must all be deemed to have accepted them with notice of what might lawfully be done with the property. For instance, the divisional mortgagees here concerned were bound to know that the consolidation which was afterwards effected was a possibility, and that, in case of the insolvency of the consolidated company, receivers might be appointed, and questions of the apportionment of income and liabilities be raised, as they have been. The power of the court to displace a first mortgage is no more open to question than its power over a second mortgage. The point now to be determined is upon what particular mortgage interest or interests shall the amount to be paid be primarily charged. When successive mortgages are upon the same property, as in most reported cases probably they have been, the question is not important, since by the prevailing practice the burden falls upon the holder of the junior security if the amount realized from the sale of the property proves insufficient for the payment in full of all liens in addition to the preferred debt. Such was the Miltenberger Case, 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117. In the present case the question is important, because the consolidated mortgage covers the western as well as the eastern division of the road, and the western division has a value largely in excess of the mortgages thereon which antedate the consolidated mortgage. It may be, too, that the equity of redemption from the underlying mortgages on some portions of the eastern division is

also valuable. **If** the consolidated company had unmortgaged property, that, of course, should be exhausted before resort to the power of courts of chancery to displace mortgages. The liabilities existing at the time of the appointment of receivers were liabilities of the corporation, and those arising out of the receivership are justly chargeable to it. The equity of redemption which it had in the entire property on July 1, 1889, it conveyed to the trustees in the consolidated mortgage, and the inquiry is whether the interest covered by that mortgage ought to be made the primary fund for the payment of the preferred debt, there not being income sufficient for the purpose. I think it should, both on equitable principles and by force of the order under which the trustee obtained an appointment of receivers.

Different portions of mortgaged land conveyed by deeds of warranty to different grantees are charged with the mortgage debt in the inverse order of the several conveyances, and there seems to me to be even stronger reason for holding that before disturbing underlying mortgages the interest covered by the last mortgage upon a railroad property must be subjected to the payment of preferential claims. This is practically so, as already suggested, when the mortgages all embrace the same property, and there is equal or greater reason that it should be so when the last mortgage covers property not touched by the earlier liens. Otherwise it will be possible for railroad companies, which have unincumbered property or interests, when they find themselves approaching insolvency, to mortgage whatever of value they may have left, with the intention that the burden of preferred claims shall be imposed upon prior mortgages. Such a course, it may be said, would be fraudulent on the part of the mortgagor, but, with the bonds secured by the new mortgage on the market and in the hands of innocent purchasers, on what ground could the transaction be assailed by the trustees in the earlier mortgages? It would not be impossible to make an apportionment between successive mortgages upon the same property by charging to each a percentage of the preferred debt equal to its share of the proceeds of the sale of the property, but that manifestly would be unjust to the owners of the prior security,—so palpably so that it does not appear ever to have been even proposed; but I do not perceive that it is less unjust to impose a part of the burden upon the prior mortgage to the advantage of the junior when the latter happens to include property not covered by the first. It is a simple and just rule, of easy and uniform application, that the burden of a railroad receivership shall fall first upon the corporation, and then, in the inverse order, upon its successive grantees or mortgagees. It is fair that the one who takes a mortgage upon the last tangible interest in a railroad company's property, knowing that there are or may arise unsecured debts which may be adjudged prior to mortgage liens, should take it subject primarily to that possible burden, because he thereby knowingly appropriates what otherwise would be the means, and the only means, of protection of the prior mortgagees against that burden. Between mortgages of the same date and rank it would be possible to effect a fair adjustment, but successive mortgages cannot, on equal terms and conditions, have come under the risk of being displaced; and

there cannot, therefore, be a just basis for an apportionment of the burden between them, when there turns out to be a preferred debt for which provisions must be made.

The Midland Case, instead of deciding the contrary, lends implied support to the proposition. The contest there, in so far as now relevant, was over receivers' certificates issued for the cost of improving that portion of the road between Paris and Decatur, the order authorizing the expenditure expressly providing that the certificates should be a first lien upon that portion of the road; but the trustees of the mortgage on that division, coming into the case at a later date, contended "that all the receivers' debt should be borne primarily by the Peoria, Atlanta & Decatur Company, in exoneration of the Paris & Decatur mortgage, on the ground that, by the terms of the conveyance of the Paris & Decatur Company to the purchasing company, the latter assumed 'all the bonded and floating indebtedness' of the selling company." The commissioner, whose opinion was confirmed by the circuit court, and finally approved by the supreme court, thought it "equitable that each property should contribute its just proportion towards defraying the necessary expenses" (a proposition as indisputable as any conceivable truism), and "that, as the Peoria, Atlanta & Decatur mortgage was executed more than two years before the purchase of the Paris & Decatur road, and as the obligation of operating the latter road, assumed by the purchasing company, was an ordinary liability and an unsecured obligation, the equities of the Peoria, Atlanta & Decatur bondholders require that the expenses of operating the purchased road, whether before or after the appointment of a receiver, should not take precedence, out of the corpus of the property of the purchasing company, over its bonds, issued and negotiated before the transfer, to the exoneration of the bonds of the purchased road." Of this proposition there could be no question, and it followed logically, as stated, "that it is more equitable that the expenses of the receivership, incurred under the direction of the court for the benefit of one road as well as the other, should be borne proportionally by each." But the plain implication accords with the deduction of reason that if the mortgage upon the Peoria, Atlanta & Decatur road had been executed, and its bonds issued and negotiated, after the transfer and after the contract of assumption, the equity of the case would have been reversed. The Ames Case, as reported, is not essentially different. It is said in one of the briefs before me that the Union Pacific Railway Company, the principal party in that case, had a large amount of personal property which was not incumbered, and in proof that the fact was urged upon the consideration of the court an extract is quoted from the brief of counsel who represented the Gunnison mortgage in that litigation; but, presumably for good reason, the point was not noticed by the court, and the force of the case must be determined upon the opinion as it stands. In the earlier case, under the same title (60 Fed. 966), it was stated "that the railroad of the Pacific Company proper, comprising about 1,800 miles, with the lands and property appurtenant to it, is incumbered by liens on various parts

of it aggregating more than $117,000,000." Attention has also been called to the fact that in the Wabash Case, as shown in 30 Fed. 332, 339, there was a large amount of unmortgaged property, including 485 miles of road; but it appears, too, that the unmortgaged portion was sold, with the other parts of the road, subject to the entire preferential debt, which remained unpaid to the amount of $2,-425,000. "All this, by the terms of the decree," says the opinion, "the purchasing committee must pay before they get undisturbed possession of the property bought," and there seems never to have been a thought on the part of court or parties in the Wabash Case of charging any portion of the preferred indebtedness upon the corpus of leased lines under separate mortgages, even though operated by the receivers at a loss, so long as it should be possible to provide for its payment out of the property of the Wabash Company.

It results from these views that, no matter what the receipts and expenditures, the trustee in the consolidated mortgage is entitled to no accounting between divisions of the road during the time of the receivers for whose appointment and operations it became responsible, and it is equally without right to an apportionment between the several mortgage interests of the receivers' debt which remained unpaid at the end of that time.

This conclusion is justifiable on another and independent ground. The property was a unit, incapable practically or rightfully of dismemberment. The entire income, no matter whence derived, was primarily applicable to the payment of the expenses of the receivership and of prior preferential debts, and out of its application in that way there could arise no obligation of one part of the road in favor of another to the displacement of a mortgage lien. There should be no apportionment of the unpaid receivers' debt, not much exceeding $300,000, because it appears that on the equipment purchased by the consolidated company, which passed under the consolidated mortgage, the receivers have paid nearly an equal amount ($287,033); and when the amounts are considered which have been paid upon equipment purchased during the receivership, on the purchase of the New Albany Belt & Terminal Railroad and the Louisville & St. Louis Railway, and the interest paid during the whole receivership upon the mortgages upon the western division of the road, all of which outlays have been, or in the end presumably will be, to the direct advantage of the consolidated mortgage, it will be evident that the holders of the latter security, though charged with the outstanding certificates and the remaining current indebtedness down to May 1, 1896, will be without substantial ground for complaint.

Still another view might be taken, namely, that, notwithstanding the bills brought to foreclose the underlying mortgages and the appointment of the receiver under each, yet since, in view of the consolidation, a dismemberment of the system would have been impracticable, and the continued operation of the road as a unit was unavoidable, the income of the entire property to the time of sale should be devoted to the payment of the outstanding certificates and current debt, and the unpaid remainder, if any, properly appor-

tioned, and that otherwise than for that purpose there should be no accounting between divisions. That was the course pursued in the Wabash Case. It is perhaps the logical result of the doctrine that income is the primary fund for the payment of current expenses and of all forms of preferred liabilities. The order here, however, will be that the liabilities prior to May 1, 1896, be charged primarily upon the consolidated mortgage interest, and, for the several periods since the extension of the receivership under the bills brought to foreclose the underlying mortgages, respectively, there shall be an accounting on the basis reported by the master, except that there shall be no charge for interest on the value of terminal properties; and the rental for equipment, in view of the fact that repairs have been made by the receiver as a part of current expenses, shall not exceed seven per cent. of the cost price, but in no event shall there be a displacement of a mortgage upon any division except for the cost of permanent betterments, unless it be shown that the operation of that division, including the payment of the taxes thereon, resulted in an absolute loss to the receivership, in which event a charge against the proceeds of the sale of the division or branch for the amount of that loss shall be allowed.

.It is contended that, of the equipment purchased by the consolidated company, a proportionate part should be deemed to have come under the several divisional mortgages, and especially enough thereof to replace equipment of the original companies which passed into the possession of the consolidated company, and has been since worn out, destroyed, or lost; but the court abides by its ruling on this question made upon a former report of the master. The after acquired property clause in each of the mortgages can rightly be construed, I think, to extend only to property subsequently acquired by the mortgagor. The consolidated company is a new and different organization. The case of Hinchman v. Railway Co. (Wash.) 44 Pac. 867, is quite in point, and in principle the question seems to be covered by the decision in Pullman's Palace-Car Co. v. Missouri Pac. Ry. Co., 115 U. S. 587, 6 Sup. Ct. 194, 29 L. Ed. 499.

The remaining question is whether the second mortgage on the eastern division of the system remains a security for the entire original issue of 3,000 bonds, or only for the 670 which were not exchanged. It was alleged in the cross bill of the New York Security & Trust Company that the intention of the provision in the ninth article of consolidation was "that any holder of a bond of a constituent company, who surrendered the same in exchange for a bond of the consolidated company, should have the bond so surrendered by him kept alive as additional security for the consolidated bond which he had accepted"; but at the hearing and in the briefs the contention of that company has been that it holds the surrendered bonds as additional security or collateral to the entire issue of consolidated bonds. Most of the decisions cited touching the question have been made in cases where there was an express agreement or provision that the original bonds, surrendered in exchange for new, should be kept alive, either for the benefit of those who surrendered them, or, perhaps, more commonly, as collateral to the

entire issue of new bonds. Ames v. Railroad Co., 1 Fed. Cas. 760; Barry v. Railway Co. (C. C.) 34 Fed. 829, 833; Central Trust Co. v. Marietta G. N. R. Co. (C. C.) 73 Fed. 589; Mowry v. Trust Co., 22 C. C. A. 52, 76 Fed. 38; Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434, 472, 6 Sup. Ct. 809, 29 L. Ed. 963; Gibbes v. Railroad Co., 13 S. C. 228; Fidelity Insurance, Trust & Safe-Deposit Co. v. Shenandoah Val. R. Co. (Va.) 9 S. E. 759. The question is one of contract or intention, and little aid is to be derived from the cited cases, since in every instance they have turned upon the construction or force to be given to a writing or contract quite different from the articles of consolidation by which the present dispute must be determined. In Mowry v. Farmers' Loan & Trust Co., supra, decided by the United States circuit court of appeals for the Seventh circuit, it was said that, "where a novation is thus sought to be established, it must be shown that the substitution of the new obligation was with design and intent to extinguish the old obligation, and as such an act would, upon its face, appear to be against the interest of the holder of the bond, such intent will not be presumed, but must be clearly established"; but the more relevant and dominant proposition was added that "where the new bonds are secured by a new mortgage, and the old bonds are surrendered to the debtor, generally a prima facie case would be established of novation when no purpose of the parties appeared to retain the elder security." The citation in support of this was Jones, Corp. Bonds, §§ 319, 320; but that author, on the authority of Fidelity Insurance, Trust & Safe-Deposit Co. v. Shenandoah Val. R. Co., supra, makes, in section 320, the broader statement, that if "a bondholder gives up his bonds, and accepts other securities in their place, there is, in the absence of any agreement governing the transaction, a novation of the debt, a payment of the former obligations, and a substitution of the latter." The bonds here in question were surrendered for exchange to the New York Security & Trust Company, one of the trustees in the consolidated mortgage, designated presumably by the board of directors of the consolidated company, in accordance with the fourth article of consolidation, as the custodian to receive and hold the new bonds "in trust for the purpose of exchange, according to the terms of the articles of consolidation." For the purpose of that exchange, the trust company was the representative of the consolidated company, and, though named also as one of the trustees in the consolidated mortgage, was performing no function or duty of trustee in that instrument; and since, by force of the consolidation, the consolidated company became responsible for all liabilities, including the bonded debt, of the several constituent companies, when any holder of divisional bonds surrendered them to the trust company for exchange, the surrender, in legal contemplation, was to the debtor, and by the rule stated in the Mowry Case the effect was to extinguish the old bonds unless there was at the time a contrary purpose.

There was, of course, no purpose on the part of the consolidated company to exercise the power, declared by Chief Justice Waite in Claflin v. Railroad Co. (C. C.) 8 Fed. 122, "to put out and keep out the

entire issue [of seconds] up to the time the bonds became due." On the contrary, the intention was to substitute the new bonds and mortgage for the old in accordance with the plan of consolidation. No proof of an intention inconsistent with the articles could prevail, and the proof reported by the master need not be regarded as going further. The secretary of the trust company, it was testified, instructed his subordinates that the bonds surrendered were to be held by that company "as against the second mortgage"; but that instruction, the report says, followed an examination of the articles of consolidation made at the time the bonds were received for exchange, and can signify no more than a conclusion of the secretary that the bonds should be so held. There is no evidence that any holder, when surrendering his bonds for exchange, expressed a desire or intention that they should be kept alive for his own advantage, or for the benefit of the company, or as an additional security for all or any part of the consolidated bonds. Except, therefore, as inferable from the articles of consolidation, there was no reservation. As the agent of the consolidated company to effect the proposed exchange of bonds, the limits of authority of the trust company were defined in the articles of consolidation, and could not be exceeded. An absolute exchange, whereby, subject to the power of the directors to act in the interest of the company, the surrendered bonds should be extinguished, it is clear was not beyond the authority conferred, but any attempt to restrict the effect of the exchange could not lawfully go beyond the provisions of the fourth and ninth articles,—of the fourth, that in case of bonds or stock of any of the constituent companies remaining unexchanged "the directors of the consolidated company shall be empowered to make such arrangement in regard thereto, not inconsistent with these articles, as in their opinion the interest of said consolidated company may require"; and of the ninth, that "the board of directors of said consolidated company may adopt such plan, not inconsistent with these articles, as shall protect the rights of the holders of new bonds issued in such exchange, as against the holder of any bond of any of such constituent companies who shall not exchange the same as herein provided." These provisions point in different directions; the first to the interest of the consolidated company, and the second to the protection of the rights of the holders of new bonds issued in exchange for old ones, as against the holder of any unexchanged bonds of whatever issue of any of the constituent companies. Upon the latter provision is based the contention that the surrendered bonds were not extinguished, but are held as collateral security for all of the consols issued, and, while it is admitted that the board of directors of the consolidated company never adopted any plan or made any declaration on the subject, it is insisted that the case falls within the rule that equity will treat as done what ought to have been done, and so give effect to what was intended. For manifest reasons the doctrine is not applicable. It was not definitely prescribed what should be done, and therefore cannot be judicially declared what ought to have been done. The board of directors had a manifest election between the two provi-

sions.   They could have made arrangements according to the first in the interest of their company, or according to the second for the protection of the rights of holders of consols issued in exchange for seconds against the holders of unexchanged bonds, not seconds alone, but of any or all of the constituent companies.   It is not for the court to say what arrangement would have been best for the consolidated company, or that the interest of that company and the contemplated protection of the rights of bondholders could both have been best conserved by the same method.   Even if we had to do with the ninth article alone, it is not evident but that different plans might have been adopted for effecting the contemplated protection of the rights of holders of the consols as against the holders of unexchanged bonds of the constituent companies, and the impossibility, on that supposition, of a remedy in a court of equity for the failure of the board of directors to act is not less evident than upon the articles as they are.   It is not clear, too, but that the arrangement or plan contemplated, in order to be availing, should have been adopted by the board of directors before the exchanges were made; but if it be accepted, as perhaps it may, that the provisions in the articles should be presumed to have been known to those who surrendered bonds for exchange, and that the exchanges effected were all made upon the condition that the board of directors might exercise thereafter the authority conferred or reserved by those provisions, yet the fact being that the power was capable of being exercised in two or more ways, was therefore discretionary, and was not exercised at all, the posture of the case is the same as if the articles had provided simply for the exchange of the old bonds secured by the respective underlying mortgages for new bonds secured by the mortgage upon the entire property.

It is to be observed, further, that of the consols issued, amounting to $3.947,000, only to the amount of $1,747,500 were they issued in exchange for bonds of the earlier issue, leaving consols outstanding to the amount of $2,199,500, the holders of which, if identified, could not rightfully be included in the plan of protection contemplated by the ninth article.

It would be of little use, though perhaps not difficult, to suggest plausible reasons for the failure of the board of directors to exercise the power which it possessed in the interest either of the company or of its bondholders.   It is enough that nothing was done; and it is clear, upon the master's report, that neither the directors of the consolidated company, nor the holders who exchanged their bonds, had any intention or understanding, at or near the time of exchange, that the surrendered bonds were to be kept alive for any purpose. There was at that time no strong motive for that course.   The seconds were already dishonored.   They were subject to a prior mortgage of $2,000,000 on the main line and of $900,000 on the Evansville Branch of the eastern division, and were regarded as worth but seventy-five cents on the dollar; while the proposed consols were rated at par, and, except for the seconds, were to be exchanged dollar for dollar for all prior bonds, most of which were secured by first mortgages upon property of ample value.   It must have been per-

ceived from the first that in proportion as the number of unexchanged seconds was reduced the probable ability of the holders thereof to take care of the prior liens would be lessened; and, on the other hand, it must soon have come to be understood that in proportion as the number increased of consols put out, by exchange or otherwise, the greater would be the ability and disposition of the holders thereof, for the protection of their own interests, and necessarily to the disadvantage of the holders of unexchanged seconds, to acquire, as but recently they have done, the control of the first mortgage bonds. It is at least certain that in respect to seconds the proposed exchange was deemed by all concerned to be of an inferior for a better security, and when by the exchanges effected the new bonds were issued, on the basis of seventy-five for one hundred retired, there naturally seemed to be no necessity for action by the board of directors, either in the interest of the consolidated company or of the holders of consolidated bonds. When surrendered for exchange the bonds were stamped "Canceled," and that, it is fair to infer, was done with the knowledge and acquiescence of the owners. To quote from the opinion in the Midland Case, 117 U. S. 474, 6 Sup. Ct. 830, 29 L. Ed. 977: "There was no contingency and no reservation on the part of those surrendering. The surrender was for cancellation and was cancellation." It is said that in that case it was contemplated in the plan of reorganization that some of the old bonds would not be surrendered, and for that reason express provision was made that a corresponding number of the proposed new bonds should be canceled. But in what respect is the present case different? The provisions quoted from the fourth and ninth articles show that it was contemplated that some of the old bonds might not be exchanged, and it necessarily resulted that pro tanto the new bonds deposited with the trust company for exchange should remain unissued; and, if in both cases the surrendered bonds were extinguished, then in both alike there was, nominally at least, a corresponding enhancement of the security of the unsurrendered bonds, though not really and to the same extent in this case, because of the large prior liens to which the second mortgage was subject.

Besides the facts already stated, there is in the record ample proof, not only that the exchanged seconds were surrendered without condition or reservation, but that to treat them as alive would be inequitable. The bonds were a negotiable security, transferable by delivery from hand to hand, and, in dealings upon the exchanges or elsewhere, it is to be presumed have changed hands, or, if not, have been held by the owners, on the faith of public representations made by those entitled to speak on the subject. On January 11, 1890, the secretary of the New York Security & Trust Company wrote to Mr. Boyd, making inquiry on the subject: "We have already retired $2,330,000 of second mortgage bonds of the Louisville, Evansville & St. Louis Railroad Company, and can offer you seventy-five cents, or $750, in new consolidated five per cent. bonds, should you desire to exchange them now. These terms are much better than we have offered before, and I trust they may meet your approval." (This indicates that prior exchanges were not made according to the articles

of consolidation.) In the general mortgage, executed on March 1, 1893, the consolidated company, whose directors alone had had power to keep the surrendered bonds alive, and the New York Security & Trust Company, which represented whatever vitality there was in the surrendered bonds, joined in the declaration that 670 of the bonds were outstanding. A like statement is contained in the bill of Barrett and Wilson, upon which the first appointment of receivers was made, and it is repeated in the answer of the consolidated company, and in the answer of Huston to that bill, in subsequent petitions of the receivers to the court for orders to pay interest, in the bill of the trust company brought on September 6, 1894, to foreclose the consolidated mortgage, in the cross bill of Huston on December 28, 1894, in petitions and reports of the receivers in March and October, 1895, and by implication in the petition of the trust company on December 23, 1895, in which it was alleged that the bonds secured by the first and second mortgages on the eastern division were outstanding "to the amount of over $2,670,000,"—a statement which could not well have been made, as it was, under oath and without explanation, if the true amount had been understood to be $5,000,000. Not until the filing of the cross bill of the trust company, on November 11, 1896, does there appear to have been an assertion or suggestion that the surrendered bonds had been kept alive for any purpose, and the purpose then alleged was broadly different from that now asserted. It was asked at the hearing, what necessity or propriety was there for an utterance on the subject at an earlier time? Merely as a matter of pleading, clearly none; but under the circumstances something was due to those who owned or might invest in the unexchanged bonds. If, in fact, there had been an intention at the time of exchange to keep the bonds alive, and a purpose when the proper time should come to insist upon the fact, it does not seem to me that the declaration of the trust company to the contrary would have been made, or that the like declarations by others would have been allowed to go unchallenged. Under the circumstances, there is certainly no substantial equity in favor of the contention that the surrendered bonds were kept alive for any purpose.

To the extent that the master's report is inconsistent with these views the exceptions will be sustained; otherwise, overruled. The form of decree which has been submitted may be modified to conform to this opinion.